MARES, RESPONDENT, *v.* DILLON, APPELLANT.

(No. 1,801.)

(Submitted March 2, 1904.　Decided March 21, 1904.)

| 30 | 117 |
| s30 | 145 |
| e30 | 191 |
| 30 | 117 |
| 33 | 522 |
| 34 | 279 |
| 30 | 117 |
| 35 | 338 |
| 30 | 117 |
| 38 | 132 |

*Mining Claims—Location—Requirements of State Statutes—Constitutionality and Validity—Stare Decisis—Actions to Determine Adverse Claims—Nature—Suits in Equity—Effect—Estoppel—State and Federal Statutes—Other Action Pending—Abatement—Instructions—Estoppel to Object.*

1.  *Held*, in view of the former decisions of this court, that Political Code, Sections 3610 *et seq.*, providing additional requirements for valid locations of mining claims to those required by the Acts of Congress, are not in violation of the U. S. Constitution and Acts of Congress (though the court entertains serious doubts as to the correctness of its former rulings in this matter).

2.  In the absence of proof tending to impeach the truth of the facts stated in a declaratory statement for a mining claim, it is immaterial to an adverse locator that the declaration was verified on information only.

3.  That the locator of a mining claim verified the declaratory statement on information only, instead of on his personal knowledge, did not render the statement void under Political Code. Section 3612, requiring such declaratory statement to be verified by the "oath of the locator."

4.  Defendant filed an application for a patent of a mining claim, the survey of which conflicted at different points with two locations made by plaintiff, known respectively as the "G. H." and "G. R. H." claims, neither of which conflicted with the other. Plaintiff filed an adverse claim on behalf of each of his claims, and afterwards brought a separate suit in support of each, and defendant, in answering the suit on the G. H. claim, referring to the action brought on the G. R. H. claim, alleged that in that action no claim was made to any portion of defendant's location by virtue of plaintiff's alleged ownership of the G. H. claim. *Held*, that plaintiff's actions were separate and distinct, and therefore the pendency of the one was no bar to the other.

5.  Since U. S. Rev. St. Sec. 2326 (U. S. Comp. St. 1901, p. 1430), providing that an adverse claimant to a mining claim, within thirty days after filing his claim, must commence proceedings in a court of competent jurisdiction to determine the right of possession, etc., does not prescribe the form of action, the character of the suit to be brought thereunder depends on state practice.

6.  U. S. Rev. St. Sec. 2326, as amended by Act March 3, 1881, c. 140, 21 Stat. 505 (U. S. Comp. St. 1901, p. 1430), providing that, if title to the ground in controversy in an action to establish an adverse claim to a mining location shall not be established by either party, the jury shall so find, does nor require that such finding should be by a jury, where the suit to determine the adverse claim is in equity.

7.  Code of Civil Procedure, Section 1310, provides that an action may be brought by any person against another, who claims an estate or interest in real property adverse to him, to determine such adverse claim ; and Section 1322 declares that, in an action to determine the respective rights of claimants to the possession of a mining claim, it is immaterial which party is in possession, and that it is sufficient if it appears from the pleadings that an application for a patent has been made and an adverse claim filed and allowed, and requires the verdict or decision to find which party is entitled to possession of the premises. *Held*, that where the complaint in an action to determine an adverse claim to a mining location set up the filing of plaintiff's adverse claim, as provided by Section 1322, after defendant had applied for a patent, and prayed that defendant be required to set forth the nature of his claim to the ground, and that all adverse claims of defendant might be determined by the judgment of the court, and the answer denied plaintiff's ownership and possession, and prayed that defendant be adjudged to be the owner and entitled to possession of the premises sued for, the suit was one of equitable cognizance, and not an action at law.

8.  Where, on the trial of a suit to determine an adverse claim to a mining location, a jury was not demanded by either party, and the court tried the case as a suit in equity, without objection by defendant, the latter was estopped to object for the first time on appeal that the action was one at law, and that he was entitled to the verdict of the jury as to which, if either, party was entitled to possession of the ground in question.

9.  Where, in a suit to determine an adverse claim to a mining location, defendant was estopped to deny that the suit was equitable in its character, he could not object to instructions to the jury.

*Appeal from District Court, Lewis and Clarke County; J. M. Clements, Judge.*

ACTION by Frank Mares against Richard Dillon, in support of an adverse claim to a mining location. From a judgment in favor of plaintiff, and from an order overruling a motion for a new trial, defendant appeals. Affirmed.

*Mr. T. J. Walsh,* for Appellant.

We desire to present for the consideration of the court, first, that the statute of the state of Montana is unconstitutional and void, because the legislature of the state has no power to legislate upon the subject at all, or if it has that power, that the particular requirement of the statute unobserved in this instance is unreasonable and, therefore, void.

The question of the validity of the legislation attacked is approached not without much diffidence, in view of its universality, its apparent sanction by congress, the general acquiescence in it, and the adjudications of this court upon it.

Notwithstanding these considerations, however, a study of the subject has convinced the writer that it is utterly indefensible and that but for the strong presumption of right which general and long continued acquiescence has given to the error, as it has given to many others, no lawyer would be heard to say that the state legislature has any power in the premises whatever.

This is a question affecting the disposition of the public lands. The controversy is as to which of the parties shall receive a patent for the land from the paramount owner, the government of the United States. The appellant has done everything which the laws of the United States specifically require him to do to entitle him to the land, but the respondent interposes and says that while that is true, he has not done certain other acts, which

the legislature of the state of Montana says he must do in order to entitle him to the possession of the ground in controversy, and to a patent for the same; the respondent further says that the appellant not having done these acts, he took possession of the ground, located it in compliance with the laws of Montana, and that by reason of so doing he should have a patent to it from the government of the United States. This contention the court sustains.

We submit that the power to dispose of the public lands is reposed by the Constitution of the United States exclusively in congress, and that the state law appealed to is unconstitutional by virtue of Section 3, Article IV, of the Constitution of the United States, as follows:

"The congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belongs to the United States."

It is by virtue of this provision of the Constitution that congress is authorized to pass laws for the sale of public lands. (*Pollard* v. *Hagan,* 3 How. 224; *DeLima* v. *Bidwell,* 182 U. S. 197.)

That the power granted by this section is exclusive has been conceded since the organization of the government. It has been so declared by the commentators on the Constitution and so held by the final arbiter on all questions of its construction. (2 Story on the Constitution, 1328; 2 Tucker on the Constitution, 605.)

Reference was made to the decisions of this court upon the question considered. In fact the question never has been decided by this court; that is to say, the effect of the above quoted provision of the Federal Constitution has never been considered by the court and, apparently, its attention has never been called to it. (*Wenner* v. *McNulty,* 7 Mont. 30; *O'Donnell* v. *Glenn,* 8 Mont. 248; *O'Donnell* v. *Glenn,* 9 Mont. 452; *Metcalf* v. *Prescott,* 10 Mont. 284; *McCowan* v. *Maclay,* 16 Mont. 234; *Sanders* v. *Noble,* 22 Mont. 119; *Purdum* v. *Laddin,* 23 Mont. 387.)

It accordingly appears from a study of the foregoing cases that so far as the question may be considered to have been adjudicated by this court, the decisions rest upon *O'Donnell* v. *Glenn,* and in *O'Donnell* v. *Glenn* the provision of the Constitution to which we now invite the attention of the court was neither urged nor considered. It was contended in *O'Donnell* v. *Glenn* that the statute was contrary to the provision of the organic act of the territory which gave to the legislature the right to legislate generally, but denied to it the right to pass any law "interfering with the primary disposition of the soil."

In brief, the court reaches the conclusion that the power to legislate upon these subjects had been either directly or by necessary implication conferred by congress upon the territorial legislature.

This case is, to say the least, not a direct authority for the exercise of this power by a state legislature. Congress may delegate certain powers to a territorial legislature. It can confer none on a state legislature. A state legislature derives none of its powers from congress. Its authority comes from the people of the state, as expressed in the constitution framed by them.

But it may be conceded that whatever power in the respect under consideration is conferred upon territorial legislatures, except such power as was presumed to be reposed in them by virtue of organic acts, an attempt was made by congress to give to state legislatures the same power.

It may even be conceded that congress attempted to confer upon state legislatures the power to legislate upon the subject and to authorize them to make rules and regulations, to enact laws prescribing the conditions upon which parties may be permitted to occupy, possess, use and exhaust public mineral lands or obtain patent to the same, but when this concession is made, we have just reached the threshold of the question, which is, can congress delegate to a state legislature any such power? *O'Donnell* v. *Glenn* simply held that the statutes of the United States had in terms delegated such power to the territorial legislature

and we concede, for the purpose of the argument, that it in terms delegated the same powers to state legislatures.

We desire to present to the court the question as to whether congress can constitutionally delegate any such power to the states. To begin, as above suggested, congress cannot delegate any power of legislation to the states. Our whole system of government is at war with any such idea. If the state legislature has this power at all, it is not derived from any act of congress. But it has no such power. The whole subject of the public lands is within the exclusive control of congress. By Section 3 of Article IV of the Constitution of the United States, congress is given power to dispose of and to make all needful rules and regulations respecting the territory or other property belonging to the United States. "Rules and regulations" in this section obviously means "laws." (*In re Higbee,* 5 Pac. 693.) And "territory" means "lands." (*U. S.* v. *Gratiot,* 14 Pet. 526.)

It will be observed that congress is given power not only to dispose of the lands of the United States, but to make all needful laws respecting them; and not to make some laws, leaving to the states power to make other laws, but congress is given power to make all laws that may be needed respecting these lands.

This language was deliberately chosen by the constitutional convention and the section was incorporated in the Constitution by reason of a condition of affairs existing at the time it was framed, the briefest study of which must convince any one that no power was left in the states to legislate concerning the public lands within or without their borders.

Conflicting grants had been made by the crown to various colonies of the lands lying west of the Alleghany mountains. Disputes over these lands became so acrid as very nearly to disrupt the confederacy before it was fairly started. With a view to relieve the situation, the congress of the confederacy, in 1780, passed a resolution urging all of the states to cede their lands and claims to lands to the general government, which undertook

by the resolution to hold them for the common benefit of all the states.  (Ordronaux, 510.)

Virginia ceded all of her lands north of the Ohio river in 1784 and by her deed of cession made the United States trustee for all of the states.  (*Indiana* v. *Kentucky,* 136 U. S. 429.) Massachusetts, New York, Maryland and other states did likewise.  The cessions were not complete even at the time of the adoption of the Constitution, and Maryland refused to ratify it except upon the condition that Virginia should cede her remaining lands.  (2 Tucker on the Constitution, 606.)

It is perfectly clear that the makers of the Constitution intended that there should be no room left to claim even that a vestige of power to legislate concerning the public lands should remain in the states and that whatever laws might be necessary respecting them congress should make.  · It has been so repeatedly declared by the courts both of the states and the nation. (*Irvine* v. *Marshall,* 20 How. 558; *Wilcox* v. *Jackson,* 13 Pet. 498; *Gibson* v. *Choteau,* 13 Wall. 92-104; *Seymour* v. *Sanders,* 3 Dill. 437 (12,690); *Russell* v. *Lowth,* 21 Minn. 167; *Miller* v. *Little,* 47 Cal. 348; *Van Brocklin* v. *Anderson,* 117 U. S. 151-167; *Cross* v. *Harrison,* 16 How. 164; *Headley* v. *Coffman,* (Neb.) 56 N. W. 701-703.)

It is impossible, therefore, to doubt that "all needful rules and regulations respecting" the public lands must be made by congress.  And this power having been placed in the hands of congress by the Constitution, it cannot, of course, be delegated to any other legislative body.  The power to make laws cannot be delegated.  (*Ex parte Wall,* 48 Cal. 279; *State* v. *Simons,* 21 N. W. 750; *Field* v. *Clark,* 143 U. S. 649.)

This rule is, of course, subject to the qualification that certain legislative functions may be reposed in subordinate municipalities, but it is needful to say that the states sustain no such relation to the general government.  The people in framing the Constitution entrusted to the general congress the making of laws respecting the public lands and never contemplated that that power was to be delegated to any other legislative body.

To what purpose did Maryland insist on cession by Virginia of her lands, if the latter might prevail upon congress to reinvest her with the power to prescribe either in whole or in part the terms and conditions upon which those lands should be disposed of?

Under our present law, at least as much is prescribed by the state statute as by the United States statutes, concerning what shall be done to constitute a valid location of a mining claim. But if the congress can delegate to the state the power to prescribe any of the conditions of a valid location, it may repeal the existing United States statutes in relation thereto and provide that the state legislature may prescribe all the conditions upon which mining claims may be located.

Having in mind the particular ground of objection in *O'Donnell* v. *Glenn,* the opinion, near the close, said: "By the reservation to itself of the sole right to dispose of the soil in the first instance, congress meant to make title to its purchasers, and receive the product of the sales, and not regard these local regulations looking to the acquisition of possessory rights merely, and their manner of enjoyment, as an interference with its prerogatives."

Of course no such comment could ever have been made upon a consideration of the constitutional provision giving to congress full power not only to "dispose of," but also to "make all needful rules and regulations respecting" the public lands. Had the state or territory not legislated upon the subject at all, a valid location could be made under the laws of the United States by simply discovering the vein and marking the location on the ground so that its boundaries could be readily traced. A location so made would give the locator more than possessory rights merely. A pre-emptioner settled upon the public domain has possessory rights merely. His rights rest upon possession alone; when he loses possession, he loses his rights. He has no property in the land that can be seized on execution, that can be sold or assigned to any person, or that will descend to his heirs, or that he can devise by his will. At his death the place

is subject to settlement by the first occupant regardless of any attempted disposition on his part.

Not so with a mining claim located according to law. Until within recent years the state of Washington has not attempted to pass any laws regulating the manner of locating mining claims or providing even for the filing of a location notice. But a mining claim located in the simple manner prescribed by the laws of the United States in that state became the property of the locator. (*Maunel* v. *Wullf,* 152 U. S. 511; *Silver Bow* v. *Clarke,* 5 Mont. 378; *Noyes* v. *Mantle,* 127 U. S. 351; *Dahl* v. *Raunheim,* 132 U. S. 262; *Sullivan* v. *Iron Silver Mining Co.,* 143 U. S. 431.)

Accordingly, the act of the legislature of the state of Montana must be regarded as laying down conditions for the "disposal" of the public domain, to say nothing of the further clause of Section 3 of Article IV, giving congress sole power to make rules and regulations "respecting" the same.

No one would pretend to doubt that if congress should enact a law declaring that location should be valid notwithstanding the notices did not contain a description of the markings on the corner, state statutes making such requirement would be invalid thereafter. But if the state statute ever did have any force, it must have been either because the power to pass it was delegated to the state legislature by congress, or because some power was left in the states to legislate upon the subject of the public lands, subject, however, to the paramount right of congress,—in other words, that the power of congress was not exclusive. Both of these positions have been shown to be untenable.

The mind glides easily into the belief that these laws are valid, because they have been in force so long and their validity has gone unquestioned. But suppose congress should pass an act authorizing the state legislatures to prescribe additional conditions upon compliance with which only could homestead claimants hold possession or obtain patents to their homesteads, and the state legislature should pass a law providing that all homestead claimants should be required to post a notice of location

upon their claims and within ninety days mark the boundaries by stakes at each corner, four inches square, by four feet six inches in length, set one foot in the ground, with a mound of earth or stone four feet in diameter by two feet in height around the post, and mark each post so as to designate the particular corner for which it stood; that they should within six months plow and sow at least ten acres (the counterpart of the discovery shaft) and within ninety days file in the office of the county recorder of the county in which the property is situated a notice of the entry specifying among other things, the markings on the corner posts, and should provide, in effect, that in case of failure by the settler to observe any of these requirements the land should be subject to appropriation by any other settler, who would be heard to attempt to justify or defend such legislation?

Still, if congress can empower the state legislature to legislate with respect to mineral lands, or if it has that power without authorization by congress, it can be empowered with or enjoys exactly the same right with respect to agricultural lands.

We must likewise, to admit the validity of these laws, maintain that congress may empower the state to add terms and conditions to those prescribed by it as a condition upon which a desert claim may be held and patented, a coal claim, a claim taken under the timber and stone act, under the forest reserve act, the act providing for soldiers' additional homesteads. In other words, we must concede the power of congress to authorize the state legislatures to supplement in any way they may see fit the acts of congress concerning the disposition of the public domain.

Power is apparently delegated to the state by Section 2324, R. S. U. S., to make such laws as it may see fit "governing the location, manner of recording and amount of work necessary to hold possession of a mining claim," but it is provided by this section that "not less than one hundred dollars' worth of labor shall be performed or improvements made during each year." If this is a valid delegation of power, the state law may require

a thousand dollars' worth of work each year, or the locator loses the property (*Belk* v. *Meagher*) which he acquired by his location and forfeits his right to acquire the legal title by patent from the government. If it were such a law the appellant was attacking, instead of one prescribing the contents of a location notice, the task would be a much easier one, simply because it would be a more unusual law. So firmly do we believe that whatever is, is right, and so much more firmly that which long has been.

Such a law as that suggested above would immediately invite attention to and inquiry concerning the source of power exercised in its passage. It is more or less significant that no state or territory has ever required by its laws more than one hundred dollars' worth of work annually and now, after the mining act has been in force thirty years, it is ventured that not more than one miner in each one hundred would concede that the state has any right to exact of him more than one hundred dollars' worth of work annually, and not more than one lawyer in ten would disagree with this opinion.

And yet the power to so legislate rests on exactly the same foundation as the law, the validity of which is here questioned. There should be uniformity in the law concerning the location of mining claims. A prospector going from Montana to Idaho must unlearn what he has learned concerning the Montana law and study the Idaho statutes or he risks the loss of a valuable claim he has discovered by his skill, labor, energy, privation and endurance. If he goes to Nevada, he must begin the lesson anew. If congress but did its duty and legislated on the subject, there would be uniformity. The man who knows how a homestead or desert claim is taken or acquired in one state may go to the bounds of the union and enter one in the same manner.

No fair or reasonable pretense, even, can be made that the constitutionality of such laws was ever considered or passed upon by the Supreme Court of the United States, or that it even impliedly expressed an opinion on the subject in any case.

Although it would be vicious legislation, congress might possibly pass an act simply declaring that all existing rules established by miners' conventions or state laws should be in force and effect. It might be argued that the adopting act by reference embraced them so that they became a part of it. But no one would contend that a law authorizing them in the future to promulgate rules and laws and providing that such should have the effect of federal statutes could be sustained. That would be a clear delegation of legislative power. But whatever congress might do in this direction, it never has done anything like it. "The recognition by congress of local customs and statutory provisions as at times controlling the right of possession does not incorporate them into the body of federal law." (*Shoshone* v. *Rutter,* 177 U. S. 505.)

The law in question is, accordingly, a state law, and in no sense a federal law. It need not be argued that if congress canot delegate to a grave, decorous and constitutional body such as a state legislature power to enact these laws, it cannot delegate such power to a miners' meeting or convention.

Nor does it help the matter to speak of these laws as local rules. The constitutional provision under consideration gives to congress the exclusive power to make all needful "rules" respecting the public lands. If these laws can be sustained then we must admit the power of congress, having repealed all existing laws for the disposition of public lands, to pass an act providing that they shall be patented to such persons on such condition as the legislatures of the states respectively in which they lie shall prescribe.

Not an idea has been advanced to sustain the power of the state to legislate in the premises, save that it has done so for many years and that, without consideration, courts have assumed the constitutionality of these laws. No foundation is even suggested to the court upon which it can stand to uphold these measures.

Unless some reason not even hinted at by counsel in either brief or argument can be advanced to show the inapplicability

of the apparently plain provisions of Section 3 of Article IV of the National Constitution, it is the plain duty of the court to declare the law attacked as an usurpation.

*Messrs. H. G. & S. H. McIntire,* for Respondent.

MR. COMMISSIONER CLAYBERG prepared the following opinion for the court:

Appellant, Dillon, made application to the United States land office for a patent to the Black Eagle quartz lode mining claim. Respondent, Mares, filed two adverse claims in the land office against this application—one based upon the Gold Hill quartz lode claim, and one based upon the Gold Rocky Hill quartz lode claim, with both of which the surface of the Black Eagle was in conflict. Within the time allowed by the statute of the United States, respondent instituted two suits, in support of his adverse claims (one on each of his locations), in the district court of Lewis and Clarke county. In the appeals under consideration, the suit based upon the Gold Hill location is involved. The action was tried by a court and jury, and from the judgment entered in favor of the validity of the Gold Hill location, and from an order overruling his motion for a new trial, appellant appeals.

### VALIDITY OF STATE STATUTE.

Counsel for appellant insists, with great force and much reason, that the statutes of Montana requiring certain acts to be performed by one locating a mining claim, in addition to the requirements of the Acts of Congress (Section 3610 *et seq.,* Political Code), are in violation of Section 3, Article IV, of the Constitution of the United States, which provides: "The congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States; and nothing in this Constitution shall be so construed as to prejudice any claims of the

United States, or of any particular state." Also, that these requirements are inconsistent with the provisions of the Acts of Congress in regard to the location of mines, and therefore void. Also, if these provisions of the state statute are held to be permitted or recognized by the Acts of Congress, then such Acts, to that extent, are in violation of the above section of the Constitution of the United States.

The question of the constitutionality and validity of our present statute, and of the provisions of the territorial statutes of a somewhat similar character, have been before this court and its predecessor, the supreme court of the territory, quite frequently, and we find that, whenever this question was discussed and decided by either court, the validity and constitutionality of these statutes have been uniformly upheld.

In *O'Donnell* v. *Glenn*, 8 Mont. 248, 19 Pac. 302, the court for the first time directly considered the point made, relative to the constitutionality of the Acts of the legislative assembly of the territory, and holds such legislation valid. Chief Justice McConnell says: "By the reservation to itself of the sole right to dispose of the soil in the first instance, congress meant to make title to its purchasers, and receive the product of the sales, and not to regard those local regulations, looking to the acquisition of possessory rights merely, and their manner of enjoyment, as an interference with its prerogatives." Of course, some distinction might be drawn between the legislative Acts of a territory and of a state, as to whether they conflict with the Acts of congress, the former being always under the direct control and supervision of congress, while the latter, if upon proper subjects of legislation, are entirely beyond congressional control.

In *Metcalf* v. *Prescott*, 10 Mont. 283, 25 Pac. 1037, this court had the matter under consideration for the first time, and says: "This court, after incidentally doubting the validity of the law of the territory requiring a location notice to be verified (*Wenner* v. *McNulty*, 7 Mont. 30 [14 Pac. 643], afterwards, in *O'Donnell* v. *Glenn*, 8 Mont. 248 [19 Pac. 302], met the proposition squarely, and held the law to be good. While we

can conceive doubts as to this power of the territorial legislature, we do not feel it our duty to disturb the rule in *O'Donnell* v. *Glenn*, and the practice established upon that rule. We therefore sustain the law."

The question came up for consideration again in this court in the case of *McCowan* v. *Maclay*, 16 Mont. 234, 40 Pac. 602, and Mr. Justice DeWitt says: "Our statute requires that the notice of location of a mining claim shall be on oath. Comp. St. Fifth Div. Sec. 1477. That this requirement of our statute is within the power of the state legislature was doubted in *Wenner* v. *McNulty*, 7 Mont. 30 [14 Pac. 643], but was finally affirmed in *O'Donnell* v. *Glenn*, 8 Mont. 248 [19 Pac. 302], which ruling was afterwards followed as the law of the case on the second appeal of *O'Donnell* v. *Glenn*, 9 Mont. 452 [23 Pac. 1018, 8 L. R. A. 629], and was followed as *stare decisis* in *Metcalf* v. *Prescott*, 10 Mont. 283 [25 Pac. 1037]. The Ninth Circuit Court of Appeals of the United States recently encountered this question in *Preston* v. *Hunter*, 67 Fed. 996 [15 C. C. A. 148], but passed it without an expression of opinion. We shall not now disturb the law of this jurisdiction in this respect."

The question was again before this court in the case of *Berg* v. *Koegel*, 16 Mont. 266, 40 Pac. 605. The court say: "This decision [of the court below] is made upon the authority of *McCowan* v. *Maclay*, 16 Mont. 234 [40 Pac. 602], to the effect that our statute requiring the location notice to be verified is not in conflict with the laws of the United States upon the subject of the location of mining claims."

It was again before this court in the case of *Purdum* v. *Laddin*, 23 Mont. 387, 59 Pac. 154, where the court uses the following language: "That the legislative assembly had power to enact Sections 3610 to 3613 of the Political Code is, in this state, too firmly established to permit of serious discussion or doubt; and that the provisions of these section are mandatory, reasonable and not in conflict with any Act of congress, seems clearly within the principles announced or tacitly recognized

in *O'Donnell* v. *Glenn,* 8 Mont. 248 [19 Pac. 302], *McCowan* v. *Maclay,* 16 Mont. 234 [40 Pac. 602], and *Sanders* v. *Noble,* 22 Mont. 119 [55 Pac. 1037]."

It was again before this court for consideration in the case of *Baker* v. *Butte City Water Co.,* 28 Mont. 222, 72 Pac. 617, and the court said: "The question as to the right of the legislature to provide rules for the marking of the boundaries of mining claims, and providing for a record of such location, and what the record paper must contain, has so long been recognized in this state, and has so many times been approved by this court, that it would be useless to enter again into any consideration of the questions so decided."

To now hold these statutes unconstitutional or void, would be to reverse these uniform decisions, which have been followed and relied upon for many years; and this should not be done unless, in the opinion of the present court, such result would be the only one possible to be reached from a consideration of the questions. We would not, therefore, be justified in such a conclusion, if, after a careful investigation, we felt any doubt as to their correctness. We cannot say that we have an "abiding conviction" that these decisions are erroneous, but, at most, only that we have serious doubts as to their correctness.

While the Supreme Court of the United States has not, to our knowledge, had the question presented to it in the same form that it is presented in this case, yet that court has indirectly at least, in many instances, held that the legislatures of the states might enact laws supplemental to the Act of congress relative to the location, possession and working of a mining claim. (*Erhardt* v. *Boaro,* 113 U. S. 527, 5 Sup. Ct. 560, 28 L. Ed. 1113; *Iron Silver Mining Company* v. *Elgin M. & S. Co.,* 118 U. S. 196, 6 Sup. Ct. 1177, 30 L. Ed. 98; *Enterprise M. Co.* v. *Rico Aspen M. Co.,* 167 U. S. 108, 17 Sup. Ct. 762, 42 L. Ed. 96; *Parley's Park S. M. Co.* v. *Kerr,* 130 U. S. 256, 9 Sup. Ct. 511, 32 L. Ed. 906.)

The same doctrine is held by the Court of Appeals of the Ninth Circuit, in *Northmore* v. *Simmons,* 97 Fed. 386, 38 C.

C. A. 211. The Supreme Court of Nevada has reached the same conclusion in *Sisson* v. *Sommers,* 24 Nev. 379, 55 Pac. 829, 77 Am. St. Rep. 815. Also the Supreme Court of Utah, in *Copper Globe Min. Co.* v. *Allman,* 23 Utah, 410, 64 Pac. 1019.

Questions of the construction of the Federal Constitution and statutes can be finally settled only by the Supreme Court of the United States. This court should not assume the authority to declare any Acts of congress to be in violation of the provisions of the Constitution of the United States, except in cases entirely clear and free from doubt. Such decision by this court would only be binding within the state, and then only until the question should be finally decided by the Supreme Court of the United States. Again, if this court should hold these statutes void because in conflict with the Federal Constitution or Acts of congress, and locations should thereafter be made not complying with their requirements, and the Supreme Court of the United States should afterwards decide to the contrary and hold them valid, all location made in the interim, not complying with their requirements, would be void. This would be a calamity which should be avoided if possible. On the other hand, if this court holds these statutes valid, all locations must comply with their requirements in order to have validity, and, if the Supreme Court of the United States should afterwards decide that they were void, no one would be injured, because all locations made in conformity with these statutes would surely be valid, even if the statutes were void, as all the requirements of the Acts of congress would be fully complied with.

We, therefore, while entertaining very serious doubts as to the correctness of this court's past ruling, in consideration of the circumstances above set forth, must refuse to declare the legislative action of the state of Montana unconstitutional.

### VERIFICATION.

The verification of the Gold Hill declaratory statement was made by Frank Mares, the locator. This verification seems cor-

rect in form and substance, and does not disclose but that it was made upon the personal knowledge of the affiant. However, evidence was given on the trial that the affidavit was made without any actual personal knowledge of the facts sworn to, but entirely upon information derived from affiant's brother and the engineer who had performed the specific acts of making the location. Counsel for appellant insists that this fact renders the location void.

The verification, by the terms of the statute (Section 3612, Political Code), is required to be made by the "locator" of the claim. Its object, as announced by the Supreme Court of the Territory of Montana, "was to prevent fraud by subjecting the locator to the penalties of perjury if he swore falsely or corruptly." If the verification is in form and substance in accordance with the statute, it is *prima facie* sufficient, and the facts stated therein are *prima facie* true. Of course, its effectiveness could be avoided by a proof that the facts verified did not exist or were untrue. This record does not disclose that any evidence was offered to challenge the truth of the affidavit, nor is it claimed that any of the facts therein stated did not exist or were not true. Therefore we must consider the verification as true, and we cannot conceive how appellant was injured, even if it was not made upon the personal knowledge of the affiant, but upon information. What concerns him is the truth of the facts verified.

Again, the statute simply provides that the statement "must be verified by the oath of the locator," etc. (Section 3612, Political Code), not that it shall only be made upon the personal knowledge of the affiant. As well said by Chief Justice McConnell, in considering a similar provision in the territorial statute, in the case of *Wenner* v. *McNulty,* 7 Mont. 30, 14 Pac. 643: "It is not usual to require such strictness, unless the statute prescribing the oath expressly requires it. The object of recording the declaratory statement is to give the public notice that a location has been made; and the object of requiring an oath was to prevent fraud, by subjecting the locator to

the penalties of perjury if he swore falsely and corruptly. If the affiant in such cases swears falsely and corruptly, he will be as much amenable to the penalties of the law denounced against perjury as if he had made the oath upon his own alleged personal knowledge; and the mere fact that the oath is absolute in form, when in fact it was made upon information and belief, does not invalidate it. 12 Myer's Fed. Dec. Sec. 1047."

We therefore cannot hold that the location of the Gold Hill lode mining claim was void on this ground or for this reason.

### ANOTHER SUIT PENDING.

Appellant sets forth in his answer the following facts, in substance: That, after he had filed his application for a patent to the Black Eagle quartz lode claim in the land office, respondent claimed that the surface area of the Black Eagle conflicted with the surface area of the Gold Hill quartz lode mining claim, and also with the surface area of the Gold Rocky Hill quartz lode mining claim, and thereupon filed an adverse claim based upon the location of the Gold Hill, and another based on the location of the Gold Rocky Hill; that afterwards respondent brought suit, in the district court of the First judicial district of Montana in and for the county of Lewis and Clarke, simultaneously on each of said adverse claims so filed, and that both suits are still pending. Counsel for appellant insists that respondent had but one cause of action, and that, having split this action into two suits, the pendency of the other suit prevents him from prosecuting this one. We find in the answer the following very pertinent allegation: "In which said action [referring to the action brought on the Gold Rocky Hill] no claim was made to any portion of said Black Eagle by virtue of plaintiff's alleged ownership of the Gold Hill lode mining claim." Respondent demurred to a portion of the answer, and, after hearing, the court sustained the demurrer thereto. To this counsel for appellant excepts, and urges the alleged error before this court.

It appears, from the plat attached to the answer, that respondent made two locations, one of which he designated the "Gold Hill" and the other the "Gold Rocky Hill;" that the surface of each of these locations conflicts with the surface of the Black Eagle, but the one does not conflict with the other. Respondent, as stated, filed a separate adverse claim to appellant's application for patent on the Black Eagle, based upon each of his two locations. We have no doubt but that this was entirely proper, and a justifiable practice, but counsel for appellant says that respondent had only one cause of action, and therefore could maintain only one suit. We think that this position is erroneous, and that respondent had two separate and distinct causes of action, one of which was based solely and exclusively on his location of the Gold Hill lode, and the other solely and exclusively on the location of the Gold Rocky Hill lode.

The action instituted is primarily for the purpose of determining who was entitled to the possession of the ground in controversy, and ultimately for the purpose of determining who was entitled to a patent for such ground. The purpose of adverse suits is in "aid of and for the information of the land department, to determine as between the litigants the right to the possession of the mining claim in dispute." (*Lavagnino* v. *Uhlig,* 26 Utah, 1, 71 Pac. 1046, citing *Doe* v. *Waterloo M. Co.,* 70 Fed. 455, 17 C. C. A. 190; *Wight* v. *Dubois,* (C. C.) 21 Fed. 694.)

Of course, the effect of a judgment in favor of respondent in either suit would be to prevent appellant from acquiring a patent from the United States for the surface ground in conflict between the locations in such suit, and to allow patent to the same to be issued to respondent. This was not the primary purpose of either suit, but would be the result of the judgment recovered.

We cannot see how the two suits instituted by respondent could possibly have been tried as one cause of action. Each is based upon a separate and distinct location. One location may

be good, the other bad.   Respondent could only recover judgment upon a valid location, because the right of possession can only come from a valid location.   The proof in each case would be entirely different; in one location respondent may have been the locator, in another he may have been the purchaser; so that proof in one case would not "fit" the other case, nor authorize judgment to be entered thereon.   As we view the proposition, it is the same in effect as though A. held two promissory notes of B., each for a hundred dollars.   Although they may bear the same date and be exactly identical in language and amount, each note constitutes a separate cause of action; and while A. may bring one suit against B. covering the two notes, each cause of action would have to be separately stated.   A. would have the right to bring suit on one note and not upon the other.   A judgment on one note would not be a bar to a suit on the other.   The pendency of the suit on one note could not be pleaded in abatement to the pendency of a suit on the other note.   If A. brought a separate suit on each note, the court, under our statute, might compel a consolidation of the causes, and try the two causes of action in the same case.   So here, possibly, although we do not desire to express any definite opinion on this proposition, Dillon might have asked the court below to cosolidate the two causes of action and have them heard at the same time, under the provisions of Section 1894 of the Code of Civil Procedure.

In order for the pendency of one suit to be pleaded in abatement in another suit, the two suits must be identical, at least in subject-matter and parties; so that, if a judgment upon the merits is obtained in one, that judgment becomes final as to both suits, and could be pleaded in bar in the other action. The question is, as this court has said, "Could the plaintiff in the former action have obtained all the relief which he alleges he is entitled to in the present action?"   (*Wetzstein* v. *Boston & Montana Consol. C. & S. Mining Co.,* 28 Mont. 451, 72 Pac. 865.)

Recalling the allegation in appellant's answer, above quoted, we find that respondent made no claim, in the suit brought upon

the Gold Rocky Hill adverse, to any part of the Black Eagle lode claim which conflicts with the Gold Hill lode claim, and in this action based upon the Gold Hill location he makes no claim to any part of the Black Eagle which conflicts with the Gold Rocky Hill. There is therefore no identity of cause of action. How can we say that a judgment in one will bar a judgment in the other? The proof would be absolutely dissimilar.

The language of the Supreme Court of the United States in *Watson* v. *Jones,* 13 Wall. 715, 20 L. Ed. 671, is particularly in point in this regard. That court said: "When the pendency of such a suit is set up to defeat another, the *case* must be the same. There must be the same parties, * * * there must be the same rights asserted, and the same relief prayed for. This relief must be founded on the same facts, and the title or essential basis of the relief sought must be the same. The identity in these particulars should be such that, if the pending case had already been disposed of, it could be pleaded in bar as a former adjudication of the same matter between the same parties." Very true, the validity of the Black Eagle location is brought into question in each of the suits, but respondent's right of action depends not only upon the invalidity of the Black Eagle location, but upon the validity of his own location in each case.

### CHARACTER OF THE SUIT.

As already stated, the suit was brought in support of an adverse claim against appellant's application for patent duly filed in the land office.

Section 2326 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 1430] provides as follows: "Where an adverse claim is filed during the period of publication, it shall be upon oath of the person or persons making the same, and shall show the nature, boundaries and extent of such adverse claim, and all proceedings, except the publication of notice and making and filing of the affidavit thereof, shall be stayed until the controversy shall have been settled or decided

by a court of competent jurisdiction, or the adverse claim
waived. It shall be the duty of the adverse claimant, within
thirty days after filing his claim, to commence proceedings in
a court of competent jurisdiction, to determine the question of
the right of possession, and prosecute the same with reasonable
diligence to final judgment; and a failure so to do shall be a
waiver of his adverse claim." Thus, the Act of congress pro-
vides that a suit shall be brought, in support of the adverse
claim, within thirty days after the filing thereof, "in a court of
competent jurisdiction."

The Supreme Court of the United States says, in regard to
this section: "Thus the determination of the right of posses-
sion as between the parties is referred to a court of competent
jurisdiction, in aid of the land office, but the form of action is
not provided for by the statute; and, apparently, an action at
law or a suit in equity would lie, as either might be appropriate
under the particular circumstances—an action to recover pos-
session when plaintiff is out of possession, and a suit to quiet
title when he is in possession." (*Perego* v. *Dodge,* 163 U. S.
160, 16 Sup. Ct. 971, 41 L. Ed. 113.) In other words, the
character of the suit depends upon the practice in the state in
which the suit is brought. If, under the statutes of the state,
an action to quiet title is provided for, such suit will be suffi-
cient; if, under such statute, an action of ejectment is provided
for, then the action may be in ejectment; if a statutory pro-
ceeding is provided for, it may be followed, but if such pro-
ceeding is made exclusive by the statute, then its provisions
must be followed; so that the only question for us to determine
is whether or not, under the statute and practice of Montana,
the action brought by respondent is an action in equity, at law,
or a special statutory proceeding.

Counsel for appellant seems to insist that he is entitled to a
verdict of the jury upon the proposition as to which, if either,
party to the suit is entitled to possession of the ground in con-
flict, and cites the amendment of March 3, 1881, c. 140, 21
Stat. 505 [U. S. Comp. St. 1901, p. 1430], to Section 2326,

which provides: "That if in any action brought pursuant to Section 2326 of the Revised Statutes, title to the ground in controversy shall not be established by either party, the jury shall so find."

This amendment was construed in the case of *Perego* v. *Dodge,* 163 U. S. 160, 16 Sup. Ct. 971, 41 L. Ed. 113, and the court said: "We do not think the intention of this Act was to change the methods of trial. Its manifest object was to provide for an adjudication, in the case supposed, that neither party was entitled to the property, so that the applicant could not go forward with his proceedings in the land office simply because the adverse claimant had failed to make out his case, if he had also failed. In other words, the duty was imposed on the court to enter such judgment or decree as would evidence that the applicant had not established the right of possession, and was for that reason not entitled to a patent. The whole proceeding is merely in aid of the land department, and the object of the amendment was to secure that aid as much in cases where both parties failed to establish title as where judgment was rendered in favor of either; and, while the finding by a jury is referred to, we think that where the adverse claimant chooses to proceed by bill to quiet title, and as between him and the applicant for the patent neither is found entitled to relief, the court can render a decree to that effect, just as it would render judgment on a verdict if the action were at law. If congress had intended to provide that litigation of this sort must be at law, or must invariably be tried by a jury, it would have said so. There is nothing to indicate the intention thus to circumscribe resort to the accustomed modes of procedure, or to prevent the parties from submitting the determination of their controversies to the court. It must be remembered that it is 'the question of the right of possession' which is to be determnied by the courts, and that the United States is not a party to the proceedings. The only jurisdiction which the courts have is of a controversy between individual claimants, and it has not been provided that the rights of an applicant for public lands, as against the gov-

ernment, may be determined by the courts in a suit against the latter. *United States* v. *Jones,* 131 U. S. 1, 9 Sup. Ct. 669, 33 L. Ed. 90; *Last Chance Mining Co.* v. *Tyler Mining Co.,* 157 U. S. 683, 694, 15 Sup. Ct. 733, 39 L. Ed. 859."

Section 1310 of the Code of Civil Procedure provides: "An action may be brought by any person against another who claims an estate or interest in real property adverse to him, for the purpose of determining such adverse claim." This section would be sufficient of itself to give authority for the commencement and maintenance of a suit to determine the matters directed to be ascertained by Section 2326 of the Revised Statutes of the United States, without any further legislative action; but the legislature went further, and enacted Section 1322, which provides: "In an action brought to determine the respective rights of claimants to the possession of a mining claim or quartz lode, under the provisions of the Acts of congress of the United States, it is immaterial which party is in possession, and it is sufficient to confer jurisdiction upon the court, if it appears from the pleadings that the application for a patent has been made and an adverse claim thereto filed and allowed in the proper land office; and the verdict or decision must find which party is entitled to the possession of the premises in dispute."

The complaint in this case alleges that plaintiff "is the owner, except as against the paramount title of the United States, and is in the possession and entitled to the possession of all and singular that certain quartz lode mining claim." He then sets out the facts necessary to a valid location, and afterwards alleges that the defendant assumed to locate a part of the claim, and made an application to the land office for a patent thereto; that plaintiff filed his adverse and commenced this suit; then alleges that the defendant "is without any right whatever, and that said defendant has not any estate, title, interest or claim to the possession of the same, or any part thereof, and that the claim of the defendant thereto casts a cloud upon the title of this plaintiff in and to his said Gold Hill quartz lode mining

claim, and greatly interferes with and injures him in the use and enjoyment thereof." The prayer of the complaint is that the defendant be required to set forth thte nature of his claim to the ground, "and that all adverse claim of said defendant may be determined by a judgment of this court."

The answer in the case denies the ownership of plaintiff, or that he is in possession or entitled to the possession of the premises, and then alleges defendant's location of the Black Eagle quartz lode mining claim, and that he made application for a patent upon the same; and prays that plaintiff take nothing by his suit, "and that the defendant be adjudged to be the owner and entitled to the possession of the premises sued for."

Both parties claim under separate locations of mining claims, and the suit was for the purpose of determining who had the right of possession to the ground in conflict, for the guidance of the land office in issuing a patent therefor.

It must be remembered that the prayer of plaintiff's complaint is that the defendant set up his adverse claims, and that the court determine that plaintiff is entitled to the possession of the property in question. The defendant sets up his adverse claim, and ends with practically the same prayer. We cannot conceive how this action could be treated as any other than one of equitable jurisdiction to determine an adverse claim. It has no semblance to an action at law, neither has the defense set forth in the answer any semblance to an answer setting forth a legal title to the premises. Both parties seem to desire the court to determine who is entitled to the possession of the premises on the adverse claim set forth. There is no allegation in the pleading upon which an action at law could be brought.

Again, appellant's attorney in the trial of the case (as recited in the record) took the position before the court below, in support of his application to submit special interrogatories to the jury, "that the interrogatories ought to be submitted because the case was in nature an action in equity."

The record does not disclose that a jury was demanded by either party. The court tried the case as an equitable case;

without objection on the part of appellant, as is very apparent from the fact that, in addition to the findings of the jury, it made several other findings. It is too late for appellant to urge the point in this court, for the first time, that the action was not one of equitable cognizance, but one at law, having tried the action in the court below as one of equity, and stated in that trial that it was a case of that character. The rule as announced by this court in the case of *Talbott* v. *Butte City Water Co.,* 29 Mont. 17, 73 Pac. 1111, as follows: "The matter was treated in the district court throughout as a suit in equity. In fact, the opening statement in appellant's brief is, 'This is an equitable action.' And without disposing of the question whether in fact it is an action at law or a suit in equity, it is sufficient to say that, when a cause has been tried upon a certain well-defined theory, neither party will be heard in this court, on oral argument, for the first time, to assume a position antagonistic to such theory. *Harris* v. *Lloyd,* 11 Mont. 390, 28 Pac. 736, 28 Am. St. Rep. 475; *Leavenworth N. & S. Co.* v. *Curtan,* 51 Kan. 432, 33 Pac. 297; *Davis* v. *Jacoby,* 54 Minn. 144, 55 N. W. 908." See, also, *Hendrickson* v. *Wallace,* 29 Mont. 504, 75 Pac. 355; *Perego* v. *Dodge,* 163 U. S. 160, 16 Sup. Ct. 971, 41 L. Ed. 113.

Two important questions suggest themselves, *i. e.,* Does Section 1322, *supra,* provide for a statutory proceeding in cases of this character? If so, does it intend that such proceeding should be exclusive? The consideration and determination of these questions do not arise in this case, as such proceeding would necessarily be equitable in character, and we have seen that appellant cannot question the equitable character of this suit.

We therefore hold, not only that the suit was actually one of equitable jurisdiction, but that appellant, by the admissions and action of his attorney in the lower court, is now estopped from saying that it was not.

Appellant's counsel having placed himself in a position where he cannot be allowed to question the equitable character of the suit, all of his objections to the instructions of the court to the

jury are unavailing. (*Hendrickson* v. *Wallace,* 29 Mont. 504, 75 Pac. 355, and cases cited.) The findings of the jury were therefore only advisory to the court, and the court was justified in making the necessary findings.

This disposes of all questions raised and argued by appelllant's counsel.

We advise that the judgment appealed from be affirmed.

PER CURIAM.—For the reasons stated in the foregoing opinion, the judgment and order are affirmed.

(Submitted March 2, 1904.  Decided March 21, 1904.)