# FRUE *et al. v.* HOUGHTON *et al.*

(*Supreme Court of Colorado, December Term, 1882—Error to the Arapa-
hoe District Court.*)

1. EQUITY JURISDICTION—SPECIFIC PERFORMANCE. Specific perform-
ance of a contract to deliver mining stocks of an uncertain value, will be
enforced in equity—there not being an adequate and clear remedy at law.

2. SAME—UNILATERAL CONTRACT. A contract which is only binding
upon one party thereto until the performance of some act by the other
party, may be revoked at any time prior to the performance of the condi-
tion; but after condition performed it becomes binding and enforceable.
Objection to jurisdiction on the ground of want of mutuality of remedy
must be made in the Court below. It comes too late when first made in
Court of review.

BECK, C. J. This was a proceeding to enforce an agreement
to transfer and deliver a number of shares of stock in the Sac-
ramento Mining Company. The plaintiffs below, Houghton
and Curley, obtained a decree for the delivery of the shares of
stock sued for, and to reverse this decree the defendants have
sued out this writ of error.

The first proposition laid down by counsel for plaintiffs in
error is, that a court of equity will not specifically enforce a
contract relating to personal property.

That courts of equity have judisdiction to decree the specific
performance of agreements, whether relating to real or per-
sonal property, is well settled. It is true that special circum-
stances must exist, entitling a party to an equitable remedy, in
order to authorize the exercise of the jurisdiction; but the author-
ities agree that its exercise does not depend upon any distinc-
tion between real and personal estate. The ground of the jur-
isdiction, when assumed, is, that the party seeking equitable
relief cannot be fully compensated by an award of damages at
law. When, therefore, an award of damages would not put
the plaintiff in a situation as beneficial as if the agreement
were specifically performed, or where compensation in dama-
ges would fall short of the redress to which he is entitled, a
specific performance may be decreed. The exercise of the jur-
isdiction depends upon the fundamental rule of equity juris-
prudence, that there is not a plain, adequate and complete

remedy at law. 1 Story's Eq. Jur., Secs. 716, 717, 724, *n* 2; Fry on Spec. Per., p. 47, Sec. 10, note 7; Pomeroy Spec. Per., Secs. 7 and 8, Chap. 1.

One of the principal objections urged against the decree is, that the subject matter of the action being stock in a corporation, there was an adequate remedy at law.

In the discussion of this objection, counsel for plaintiffs in error insist that equity will not enforce a contract for the transfer of ordinary mining stocks.

We find the authorities somewhat conflicting upon questions of this character. They are uniform on the proposition that a covenant for the delivery of government stocks, and other public securities, will not be enforced in equity. *Ross* v. *The Union Pacific Railway Co.*, 1st Woolworth, 26; Pomeroy Spec. Per., Sec. 17.

The reasons asssgned for the rule respecting public stocks are, that these stocks are always for sale, their prices are known, and the damages awarded at law will enable the injured party to make himself whole by purchasing in the market.

The English authorities decline to extend the rule to contracts for the delivery of the stocks of railways and other companies, and the English Courts decree specific performance of such contracts, upon the ground that such shares or stocks are of uncertain value, and not always readily obtainable in the market. 1 Story's Eq. Jur., Sec. 724 *a*.

The rulings of the Courts of this country have not been uniform upon these questions, some of them following the English rule, others, recognizing the fact that the reasons for that rule do not apply with equal force in this country, have adhered to the rules applicable to equitable remedies in other cases.

In *Ross* v. *The Union Pacific Railway Company, supra*, Mr. Justice Miller assigns strong reasons why a contract to transfer certain shares of that railway company should not be specifically enforced. He says:

"I see no sound reason for any distinction between them and government stocks. They belong to a class of securities which are generally called stocks; they are the subject of every

day sale in the market, and the rates at which they are selling are quoted in the public commercial reports, so that their value is as readily and certainly ascertained as that of government stocks. No especial value attaches to one share over another, and the money which will pay for one will as readily purchase another. The damages, then, for failure to deliver such shares, may be awarded at law, and be an adequate compensation for the injury sustained."

These views appear to be sustained by the weight of authority, and upon principle seem equally applicable to the shares or stocks of all corporations concerning which the same facts therein recited exist. See Pomeroy Spec. Per., Sec. 19, and cases cited.

Does the case at bar come within this rule? Do these same facts exist in respect to the shares of stock of this mining company?

We learn from the record that the entire stock consists of ten thousand shares at $10 per share, and that up to the time of the purchase, by plaintiffs in error, of the 7,333 shares, no sales had been made. The five original trustees held and owned, up to that date, 2,000 shares each, which comprised the entire stock.

What were the values of these shares? Plaintiffs allege in their bill that the shares bought were reasonably worth $20 per share. The price paid was $7.50 per share, and a portion of the defendants say that was an adequate and fair price, while the defendant who negotiated the purchase avers, in his separate answer, that whether the shares are worth $20 per share is unknown to both parties. It is fair to assume, then, that, up to the time these proceedings were instituted, the number of shares were limited; that these shares had no fixed or marketable value; that they were not selling upon the stock boards; and they were not quoted in the commercial reports. Certainly, then, their value could not have been "as readily and certainly ascertained as that of government stocks."

It is very apparent that there is a wide distinction between the shares of stock of such a mining company, and public stocks, government securities, or the stock of corporations which have been placed for sale upon stock boards, and are the

40

subject of every day sale in the financial markets of the country.

This case comes within the principle decided in *Treasurer* v. *Commercial Mining Co.*, 23 Cal., 391.   Here, as in California, we have numerous mining corporations.   It may likewise be said, as to many of them, that their business and mining operations are in a peculiar condition; their stock is of uncertain value, and difficult to substantiate by competent testimony; yet it may have a peculiar value to those acquainted with their affairs.   The risk, also, of the personal responsibility of individuals and corporations is equally great.

In the present instance, most of the defendants below are non-residents of the State, and their answers to the charge in the bill that they have no property or effects within the jurisdiction of the Court, or in the State, out of which a money judgment could be made, are neither clear nor satisfactory.

This charge is only denied in the answers as to the defendants Hubbell and Vestal.   Hubbell says that he and Vestal "are possessed of and entitled to real property within the State of the value of $10,000, or thereabouts."   Vestal does not answer at all, while Brown, assuming to know more about the financial affairs of these two men than they do themselves, answers that they are each possessed of property within the State of the value of $10,000.

According to Hubbell's estimate (aside from the ambiguity of the language employed descriptive of their title), the value of the real property referred to as owned by himself and Vestal, would fall far short of satisfying the plaintiffs' claim, placing the shares of stock at the lowest estimate.

We do not think that the remedy at law under such circumstances would be either certain, adequate or complete.

Another answer to the objection to the jurisdiction is, that the record does not show that the objection was made in the District Court.

It cannot be said that the subject matter of the action is outside the pale of equity jurisdiction.   By answering, therefore, to the complaint, instead of demurring thereto, and by voluntarily going into a hearing upon the merits, and failing to raise the question of jurisdiction at any stage of the trial, the

defendants have waived all objections to the nature of the relief sought and decreed. The Court being competent to grant relief, and having jurisdiction of the subject matter, it was its duty to entertain the cause, and to render a decree in accordance with its findings. *Derry* v. *Ross,* 5 Colo., 295; *Cutting* v. *Dana,* 10 C. E. Green, 272-3; *Clark* v. *Flint,* 22 Pick., 231.

The point made by counsel, that, under Sec. 56 of our Code of Civil Procedure, which provides that the question of jurisdiction may be raised at any time, such objection in the present case may be raised for the first time upon appeal or writ of error, is not only unreasonable, but is defeated by the authority cited in its support (note to Sec. 434, Harston's Pr.) The conclusion then arrived at is, that where the objection, if true, would only defeat the present right to recover, it must be made in the Court of original jurisdiction.

It could not have been the intention of the framers of the Code, that where a cause is being tried in a Court having jurisdiction of the subject matter of the action, and competent to administer either equitable or legal relief, as the case may warrant, an objection of this nature may be silently reserved, and afterwards raised for the first time in the appellate court, whereas, if seasonably made at the hearing, might have saved the labor and expense incident to a new trial.

Another reason assigned why this contract should not be specifically enforced, is want of mutuality.

Counsel lay down and insist upon the broad proposition, that "Courts of equity will never interfere to enforce a contract at the instance of one of the parties, which could not be enforced in equity at the instance of the other."

While the general rule requires mutuality of obligation, as well as mutuality of remedy to authorize a specific performance, yet the doctrine is greatly narrowed by numerous exceptions and limitations found in the decided cases.

Mr. Pomeroy, whose work upon this subject is cited most frequently by counsel for plaintiffs in error, speaking of this rule, says:

"I think it very clear that the rule was applied with much more strictness and severity in the older than in the later decisions; indeed, the rule, so far as it relates to the mutuality of

the remedy alone, is evidently based upon no principles of abstract right and justice, but, at most, upon notions of expediency; and the arguments in its support are often mere repetitions of time-honored verbal formulas, which, when closely analyzed, are found to have little or no real force and meaning." Pomeroy Spec. Per., Sec. 169, n. 1.

The class of contracts to which the contract in this case belongs is cited in the authorities as an exception to the general rule. It is styled a conditional or unilateral contract. The promisor binds himself to execute the agreement on his part, upon happening of the condition, or upon performance, within a stated period of time, by the other party, of certain acts or considerations. Up to the time of such performance, these undertakings usually lack the elements of binding contracts. The promisee, in many instances, not being bound at all, the promisor is at liberty to revoke the promise on his part at any time before acceptance or performance. Upon performance of the condition, however, the contract is said to become absolute and mutual in its obligations. A decree cannot then be prevented by setting up the original lack of mutuality. Fry on Spec. Perf., Sec. 599, note 5; Pomeroy Spec. Perf., Secs. 168, 169, and notes; *Gordon et al.* v. *Darnell*, 5 Colo., 302; *Laning* v. *Cole*, 3 Green's Ch., 229; *Cutting* v. *Dana*, 10 C. E. Green, 265.

In the comprehensive language of Mr. Justice Lawrence, in *Perkins* v. *Hadsell*, 50 Ill., 216, "the mutuality and the consideration consists in having actually done, upon the promise of the other party, what he required to have done, and it is immaterial that it was done without having entered into a previous undertaking to do it."

It is unnecessary for us to review the case upon the evidence. In our judgment, upon examination of the evidence, it supports the decree.

The charges that false and fraudulent representations were made by Houghton to the defendants concerning his option upon the stock, are not supported. In fact, they are disproved alike by the testimony of both parties. Brown, who represented the defendants in the negotiations, was taken by Houghton to the owners of the shares and introduced to them, pending the negotiations. He testifies himself that he was, for several

days, in their immediate vicinity, where he had opportunity, during the whole time of the negotiations, to inquire of them concerning this option. He failed to do so, but availed himself and his co-defendants of the services of the plaintiffs until after the completion of the purchase.

Now they seek, by this puerile charge, to avoid payment of the stipulated consideration.

The fact that the amount of the compensation agreed upon seems to be disproportioned to the services rendered, cannot now avail. The contract was deliberately and voluntarily made by parties competent to contract, and its terms and conditions were fully understood by the defendants, as is shown by the testimony and exhibits.

The decree is affirmed.

*Wells, Smith & Macon*, for plaintiffs in error.
*Markham & Patterson*, for defendants in error.