## No. 14,005.

### McMullin et al. *v*. Magnuson et al.

(78 P. [2d] 964)

Decided April 4, 1938.   Rehearing denied May 9, 1938.

232

Mr. Floyd J. Wilson, Mr. Frederick Sass, Mr. Roy A. Payton, for plaintiffs in error.

Mr. A. T. Stewart, Mr. V. G. Seavy, for defendants in error.

*En Banc.*

Mr. Justice Knous delivered the opinion of the court.

On March 1, 1928, the "Mica Lode" was located as a lode mining claim by the predecessors in interest of Colorado Feldspar Company, one of the defendants in error. The defendants in error Ralph H. Magnuson and Western Feldspar Milling Company went into possession of the claim on October 17, 1931, under a lease from the Colorado Feldspar Company and a then co-owner, B. O. Halsted, likewise a defendant in error, whose interest has since been acquired by the Colorado Feldspar Company, providing for the operation of the property on a royalty basis. During the period herein involved the claim has been continually in the possession of the Colorado Feldspar Company and its lessees. In 1930 the Colorado Feldspar Company located Suzana 1 to 5 inclusive and Feldspar 1 and 2, as lode mining claims in the same area and has since been in possession thereof.

The "Mica Hill Placer No. 1" containing 160 acres covering the Mica lode and a portion of the other claims mentioned, was filed as a placer on September 16, 1933, by the plaintiffs in error. These placer claimants thereafter filed their application for patent in the United States Land Office at Pueblo, the publication of notice thereof ending November 5, 1934. On June 2, 1934, the placer locators served notice of their claim and demand for possession on the lessees of the Mica Lode, where extensive and profitable mining operations were being carried on. Upon receipt of this notice the lessees withheld further payment of royalties, and June 26, 1934, instituted the proceeding now before us for review, joining the lode claimants and the placer locators as parties defendant, alleging the controversy as to the possession and ownership of the premises upon which plaintiffs were conducting mining operations, and praying that the court require the defendants to enter their appearance and have determined as between themselves the ownership and title to the minerals contained in the Mica Lode, to the end that plaintiffs might be judicially advised as to whom royalty payments should be made. Plaintiffs fur-

ther asked that both groups of claimants be restrained from interfering with plaintiffs' mining operations and that they be permitted to hold the accruing royalties in a trust fund to be disposed of as should be determined. This fund, deposited in the registry of the court, and under stipulation of the parties invested in United States bonds, now amounts to some $90,000.

In due course and through extensive pleadings in the form of answers, cross-complaints and replies, original and amended, all of the defendants appeared in this proceeding. The group of defendants claiming by the placer location, who are the plaintiffs in error here and to whom we shall refer either by that title or as the placer claimants, asserted ownership of the property by virtue of their placer location and alleged that the ground was not subject to lode location by reason of which the lode claimants had no valid right to the premises. The original defendant, the Colorado Feldspar Company, to whom we shall hereafter refer by that name or as the lode claimant, claimed the property by virtue of its lode locations and asserted the invalidity of the placer filing. The remaining original defendant, B. O. Halsted, disclaimed any interest in the property and the record shows that he had conveyed his interest therein to the Colorado Feldspar Company.

Thus, after the issues were framed, we find the rival groups of defendants—the lode claimants on the one hand and the placer claimants on the other—arrayed to finally litigate on the merits the validity of their respective mineral locations, the one as against the other, with the original plaintiffs disinterestedly standing by, though continuing their mining operations, awaiting a determination of this issue in order that they might be advised as to which locator the royalties, accrued and to accrue, should be paid.

The ultimate question decisive of practically all of the points raised by the assignments of error, is whether the premises involved were subject to location as lode

mining claims or as a placer mining claim. The evolution of the controlling United States statutes relating to mineral land locations was well epitomized in *Henderson v. Fulton*, 35 Dec. Dept. of Interior, 652, where it is said:

"The first general mining statute passed by Congress was the act of July 26, 1866 (14 Stat., 251). Provision was made for locating, working and holding, and obtaining patent for, any 'vein or lode of quartz or other rock in place, bearing gold, silver, cinnabar or copper.' By the act of July 9, 1870 (16 Stat., 217, Sec. 12) [Sec. 2329 U. S. R. S., 30 U. S. C., Sec. 35], it was provided that claims usually called 'placers,' including all forms of deposit, excepting veins of quartz, or other rock in place, should be subject to entry and patent under like circumstances and conditions, and upon similar proceedings, as were provided for vein or lode claims.

"By the act of May 10, 1872 (17 Stat., 91) [Sec. 2320, U. S. R. S., 30 U. S. C. Sec. 23], the terms of the act of 1866 were enlarged in their scope. *Lead* and *tin* were included amongst the specifically mentioned minerals and the words 'other valuable deposits' were added. * * *

"From this resume of the legislation on the subject it clearly appears that Congress, in providing for the use, occupancy and sale of the mineral lands of the United States, * * * has divided such lands into two distinct classes, namely: (1) Those which contain veins or lodes of quartz or other rock in place bearing mineral of value, of any kind or character that may be found in rock in place; (2) Those containing what are usually called placers, including all forms of deposit, of whatever kind or nature, other than the deposits described in the first class."

The commercially valuable mineral found in the ground involved in this proceeding is feldspar, a nonmetallic substance. The addition to the 1866 statute, supra, of the term "other valuable deposits" to the enumerated metallic minerals, makes it evident that the intention of Congress was to enlarge the scope of the mining laws and

embrace therein every character of deposit, metallic or nonmetallic, found in veins of rock in place which fall within the meaning of "mineral" in its broadest sense. *Webb v. American Asphaltum Co.*, 157 Fed. 203, 84 C. C. A. 651; *Nephi Plaster & Mfg. Co. v. Juab County*, 33 Utah 114, 93 Pac. 53, 14 L. R. A. (N. S.), 1043; *Northern Pac. Ry. Co. v. Soderberg*, 188 U. S. 526, 23 Sup. Ct. Rep. 365, 47 L. Ed. 575; *San Francisco Co. v. Duffield*, 201 Fed. 830.

■ ■ Under the terms of the statute, section 2329, supra, a placer location cannot be made upon rock in place bearing valuable mineral. If the mineral substance is not found in veins of rock in place, the ground would be subject to placer location. This situation was well illustrated in the opinion in *Nephi Plaster & Mfg. Co. v. Juab County, supra,* wherein it was pointed out that iron ore, a metallic mineral, not specifically named in the act, is sometimes found in veins of rock in place and also occurs in beds and superficial deposits. Where it is found in veins, lands containing it must be appropriated under the lode laws. Where it is not found in veins of rock in place, the proceedings to obtain title are governed by laws prescribed for placer locations. *In re McDonald,* 40 Dec. Dept. of Interior, 7. If here, then, the feldspar occurs in veins or lodes of rock in place, of necessity the lode claimants must prevail; otherwise the placer location is good. In reaching a conclusion on this point no question of law is involved, excepting in so far as the determination of what constitutes a vein might be so considered, which also is a question of fact to be determined from the evidence. *Esselstyn v. Gold Corporation,* 59 Colo. 294, 149 Pac. 93.

■ The meaning of the words "lode" and "vein," as contemplated by the statute, has often been the subject of judicial consideration. Judge Hallett was quoted in *Stevens v. Williams,* 1 McCrary, 480, at page 488, as saying: "In general it may be said that a lode or vein is a body of mineral or mineral body of rock, within defined boundaries in the general mass of the mountain."

In *Beals v. Cone,* 27 Colo. 473, 62 Pac. 948, generally considered a basic authority on this subject, at page 486, the essentials are mentioned in the following words: "The controlling characteristic of a vein is a continuous body of mineral bearing rock in place, in the general mass of the surrounding formation. If it possess these requisites, and carries mineral in appreciable quantities, it is a mineral bearing vein, within the meaning of the law, even though its boundaries may not have been ascertained."

Definitive of a lode, in *Henderson v. Fulton, supra,* quoting from Barringer and Adams on the Law of Mines and Mining, at page 661, it was said:

"A lode, therefore, * * * means a body of mineral-bearing rock lying within walls (which should be well defined, but sometimes are not) of neighboring rock, usually of a different kind, but sometimes of the same kind, and extending longitudinally between those walls in a continuous zone or belt.

"The only essential quality of the rock included within the boundaries is that it must contain a trace of valuable mineral. It may be loose and friable, or very hard. Still it is vein matter if it is inclosed within the country rock. Thus the two essential elements of a lode are (a) the mineral-bearing rock, which must be in place and have reasonable trend and continuity, and (b) the reasonably distinct boundaries on each side of the same."

All of the witnesses for both parties who gave testimony on this subject seem to agree that the feldspar occurs in the rock technically known as "pegmatite" (an aggregation of feldspar, mica and quartz), or at least, in a pegmatitic formation. That feldspar is a mineral and commercially valuable in this location also is conceded. Without exception the witnesses on this issue for the lode claimants, including a number of qualified mining experts, testified that the pegmatite occurred in the form of a vein, lode, lead or ledge as they variously designated it, in place, within distinct walls of country rock of a character

different from the vein matter. They stated the walls and country rock on the north of the mineral body was a basic granite, while the south wall and country rock on that side was predominatingly schist. All agreed that the pegmatite formation could be followed on the surface of the ground for variously estimated distances, all of considerable extent and that its trend and course were northwest and southeast. Those who mentioned it, testified that the width of the vein between the walls varied from 300 to 600 feet and that its general dip was towards the north, though at the point of development the mineral body is nearly perpendicular. As no extralateral rights are involved in this proceeding the matter of the dip, of course, is secondary.

Opposed to this was the testimony of the placer claimants' witnesses, also among whom were experts on mining, to the effect that here the feldspar is not in vein formation, nor is it contained within fixed or well defined walls but is country rock itself comprising the mass of the mountain. One of these witnesses, in language as abstracted picturesquely described the results of his observation as follows: "This rock is in place as the Rocky Mountains are in place; is a part of the country uplift, cannot be segregated from anything else; is integral in the sense that it is part of the whole uplift. * * * Feldspar being mined is rock in place as any other country rock is, because it is all one mass thrown up together at the same time."

With profound scientific acumen, not even surpassed by their experts, counsel for the placer claimants, two of whom did not appear in the trial of the cause below, present a technical discussion of the geological genesis of this pegmatite body. Based on certain mineral nomenclature used by the experts, coupled with general deductive reasoning from all of the evidence, counsel conclude that the pegmatite in the involved mineral body is a simple pegmatite, which means that it is in its original form, as distinguished from a complex pegmatite, the name at-

tributed to this rock when its original form is altered by the replacement action of later hydrothermal solutions. On this premise they argue that this mineral deposit was formed by the magma process, i. e., molten rock material originating within the earth being projected into its present position where it cooled and solidified. They theorize that when this intrusion took place the magma was deeply buried within the earth with no outlet to the surface to permit the volatile minerals to escape, as a result of which the pegmatite formed in coarse grained crystals in the original magma in the extending cooling process; that subsequently and through the geological ages the overlying rock was eroded and the present formation exposed on the surface. On this premise they say that a mineral body so created is not a vein or lode in a strict geological sense but is a dike, or even a mineralized portion of a mass of country rock which, they argue, is subject to location only under the placer laws. They contend that veins and lodes in the sense contemplated by the statute, can be formed only by hydrothermal process through which there is a mineral replacement by means of the action of a solvent.

Interesting as is this theory, and without reference to its soundness from a geological standpoint, its weakness as an argument here lies in the circumstance that by no statute or judicial pronouncement is the origin or method of formation of a mineral body controlling in determining whether the ground is subject to location as a lode or placer. On this subject, and pertaining to the statutes here under consideration, Mr. Justice Field, in *Eureka Consolidated Mining Co. v. Richmond Mining Co.*, 4 Sawyer 302, Federal Case No. 4548, well said: ''Those acts were not drawn by geologists or for geologists; they were not framed in the interests of science, and consequently with scientific accuracy in the use of terms. They were framed for the protection of miners in the claims which they had located and developed, and should receive such a construction as will carry out this purpose. The use of

the terms 'vein' and 'lode' in connection with each other in the act of 1866, and their use in connection with the term 'ledge' in the act of 1872, would seem to indicate that it was the object of the legislator to avoid any limitation in the application of the acts, which a scientific definition of any one of these terms might impose. It is difficult to give any definition of the term as understood and used in the acts of congress, which will not be subject to criticism. A fissure in the earth's crust, an opening in its rocks and strata made by some force of nature, in which the mineral is deposited, would seem to be essential to the definition of a lode, in the judgment of geologists. But to the practical miner, the fissure and its walls are only of importance as indicating the boundaries within which he may look for and reasonably expect to find the ore he seeks. A continuous body of mineralized rock, lying within any other well-defined boundaries on the earth's surface and under it, would equally constitute, in his eyes, a lode. We are of opinion, therefore, that the term as used in the acts of congress is applicable to any zone or belt of mineralized rock lying within boundaries clearly separating it from the neighboring rock.''

It may also be mentioned that in *Webb v. American Asphaltum Co., supra,* the authoritative decision on the proposition that lode locations may be made on non-metallic minerals, it was held that a string shaped injection of asphalt, a bituminous material, as we understand, formed by neither a magma or hydrothermal process, in place between walls was subject to location as a lode and not as a placer.

As has been said, the question must be resolved upon the facts as to the form and character of the mineral body and if here it is in place, in lode, or vein formation, regardless of its origin, the ground must be located as a lode and not as a placer.

The trial court, after hearing the evidence and inspecting the premises, found and decreed: ''3. Finds, That the Feldspar found in and upon the Mica Lode Mining

Claim more particularly described hereinafter, and in the other premises in dispute and controversy in this action, is in rock in place, between walls, and is in lode formation, and was and is legally and properly locatable as lode mining property, and not legally locatable as placer mining property, * * *.''

It is certain, as appears from the record and the testimony we have synopsized, that there was a sharp conflict in the evidence as to the actual and physical facts relating to the form, appearance, location and characteristics of the feldspar deposit. Under these circumstances and in accordance with the often announced and well settled rule in this jurisdiction and adopted by appellate courts generally, we will not disturb the findings of the trial court on this issue of fact. We are constrained to add that in our opinion the great weight of evidence upon this disputed question preponderates strongly in favor of the lode claimants and was amply sufficient to warrant the court in finding, as a matter of law, that the feldspar was in a vein or lode formation.

The conflict of opinion, as opposed to a conflict on facts, suggested by counsel for the placer claimants in attempted avoidance of the rule last mentioned, arises in connection with the diversity of opinion of the expert witnesses for the respective parties as to whether the ground should be located as a lode or placer. The conclusion of this question was for the court and if the expressions of the experts on this subject were properly admissable as evidence, which we seriously doubt, none of them could be of weight beyond the facts upon which they were based and which each stated in detail. So, in the final analysis, the primary contradictory testimony was of a factual character.

Our affirmance of the judgment of the trial court to the effect that the property can only be located as lode mining property and not as a placer, directly disposes of the assignment of errors challenging the sufficiency of the original discovery of the Mica lode, the validity of the

original and amended location certificates for certain of the lode claims, the compliance with the law requiring staking and marking of the boundaries of the claims and the sufficiency of the annual labor requirements in connection therewith. These matters would be proper subjects of inquiry if any question of seniority or priority between two lode locators as to their respective lode locations was at issue or if a forfeiture for failure to do the annual work was asserted by one making a relocation in proper form and under the applicable statute on the same ground, but they cannot be considered where it has been determined, as here, that the asserted claim to the premises of the party advancing the objections, at its inception and since, was without force or effect.

██ ██ The patent application for the Mica Hill Placer Number One was filed August 2, 1934, and an adverse claim under section 2326 of the United States Revised Statutes was filed in the land office on November 14, 1934. Section 2326, supra, provides that after the adverse claim is filed, the adverse claimants must bring a suit to determine the question of the right of possession within thirty days. A suit in support of an adverse is ordinarily at law by ejectment and such is likely the form of action where the plaintiff is out of possession, but where the plaintiff already is in possession he may proceed in equity by a bill to quiet title. This view making the form of action depend upon whether plaintiff is in or out of possession, is that which is clearly expressed in *Perego v. Dodge,* 163 U. S. 160, 16 Sup. Ct. 971, 41 L. Ed. 113, the controlling authority on this subject. When the case at bar was instituted the lode claimants were in possession and in due course prayed that title to the premises be quieted in them as against the placer claimants, who likewise in effect asked the same relief with reference to the lode claimants. When a suit is already pending between the same parties for the recovery of the ground in conflict at the time of the filing of the adverse, it has been held that such suit may stand as a suit to support the

adverse and no new suit need be brought. *Re Northwestern Lode and Mill Site Co.,* 8 Dec. Dept. of Interior 437; *Re Little Grant Lode,* 29 Dec. Dept. of Interior 194; *Jones v. Pacific Dredging Co.,* 9 Idaho 186, 72 Pac. 956.

It may be noted also that in the lower court counsel for the placer claimants, inconsistent with their attitude here, insisted the case was an adverse proceeding. This is clearly demonstrated by the statement of Mr. Payton, the attorney for the placer claimants in the trial below, when, in discussing the order in which the parties should proceed, he said: "I may say, as I understand the situation, it is about this: Mr. White brought a suit, setting forth the issue, stating that they have paid money, which my clients claim and the other defendants claim; therefore this Court has to determine to whom this money should be paid. The proceedings, after that, is that these people are out of the picture awaiting the determination of the issue between the lode claimants on the one hand—and the placer claimants on the other; and from this point forward, it seems to me, it is a straight adverse suit with these people being bystanders awaiting the outcome. Although it is true Mr. Stewart's original pleadings in this case raised some questions involving an interpleader; but as the situation now stands, so far as the mechanics of procedure is concerned, it seems to me it occupies the status of an adverse suit."

As a basic principle of procedure the matters presented for review in the appellate court should be limited to questions submitted to, and passed upon by, the trial tribunal, and we can not look with favor upon a contention of a party made here for the first time, especially where it is inconsistent with the position of that litigant in the court below. We have no hestitancy, therefore, in holding that the pleadings of the lode claimants in the case before us were sufficient to support the adverse and that no duty rested upon the lode claimants to bring a separate adverse suit under these circumstances.

What we have said in this connection largely

disposes of the placer claimants' assignment of error based upon the trial court's overruling of their motion to strike the reply of the Colorado Feldspar Company to the answer of plaintiffs in error. In the court below the asserted grounds for the motion to strike were that the reply was not filed in apt time; that it was filed without leave of court first had and obtained; and that it attempted to bring new parties defendant into the action after the same was at issue and had been set down for trial. The denial of the motion to strike was a matter properly within the trial court's discretion and no abuse appearing the ruling will not be disturbed by us. *Spalding v. Porter,* 94 Colo. 496, 31 P. (2d) 711. The placer claimants now argue that this reply was the first and only pleading of the Colorado Feldspar Company which can be considered as meeting the requirements of section 2326, supra, as an adverse suit, and say that because it was not filed within the thirty day period the court erred in not striking the belated pleading. This contention could be disposed of adversely to placer claimants, because no objection on this ground was made to the trial court; however, we believe that even before this reply was filed, the pleadings were amply sufficient to raise the proper issues in support of the lode claimants' adverse claim.

Neither is it necessary for us to consider the question now raised for the first time as to the plaintiffs' right to file this suit, and the jurisdiction of the trial court to entertain it, suggested on the theory that the case does not contain the necessary elements of an interpleader suit, as plaintiffs in error say it is. No move to dismiss the proceeding was made by the plaintiffs in error in the trial below, but on the contrary they voluntarily and aggressively availed themselves of the opportunity to assert their claim to the premises in controversy. They now say that this point is jurisdictional and presumably under section 56 of our Code of Civil Procedure cannot be waived. In this plaintiffs in error are wrong. The jurisdictional objection here would only affect the present

right of plaintiffs to the relief sought. The trial court had jurisdiction of the subject matter of the action and was competent to administer either equitable or legal relief. Under such circumstances an objection of this nature cannot be silently reserved and afterwards raised for the first time in the appellate court. *Frue v. Houghton,* 6 Colo. 318; *Derry v. Ross,* 5 Colo. 295.

The decree of the trial court recites: ''This action having been heretofore tried to the court without a jury, the parties respectively having waived trial by jury.'' The placer claimants assign error on this finding and say they did not waive trial by jury, and further insist that if this case is treated as an adverse proceeding, trial by jury is imperative and cannot be waived under the provisions of section 32, Title 30, U. S. C. A., which provides: ''If, in any action brought pursuant to section 30 of this Title, title to the ground in controversy shall not be established by either party, *the jury shall so find,* and judgment shall be entered, * * *.'' The Supreme Court of the United States, in the case of *Perego v. Dodge, supra,* has ruled against this precise contention and held that in an adverse suit a jury can be waived by a party. To the same effect are *Providence Gold-Mining Co. v. Burke,* 6 Ariz. 323, 57 Pac. 641, and *Mares v. Dillon,* 30 Mont. 117, 75 Pac. 963. It is definitely certain from the record here that the plaintiffs in error at no time demanded a trial by jury or objected to the case being heard by the court, and, as we held in *Cone v. Montgomery,* 25 Colo. 277, 53 Pac. 1052, also an adverse suit determined by the court without a jury, their silence must be deemed to have been an acquiescence in the procedure followed of which they cannot now complain.

After trial of the cause and while the matter was under advisement, the court of its own motion entered an order requiring Charles B. Blessing and Ruby May Rossi, who are included here as defendants in error, to appear and plead. These parties were grantees of Carmen B. Rossi and Berna Fletcher, plaintiffs in error, respectively,

in deeds of record covering an interest in the "Mica Hill Placer No. 1" claim and were brought into the proceeding upon the theory that complete determination of ownership of the involved premises could not be had until all persons who claimed an interest therein were in court. Thereafter both the new parties entered their appearance and waived the right to introduce any testimony or to object to any of the proceedings theretofore had in this proceeding and consented that judgment might be entered without the taking of further or additional testimony. We are unable to perceive, and plaintiffs in error fail to disclose, how this procedure was in any way prejudicial to their substantial rights, and this objection must, therefore, be taken as having no merit. *Parker v. Ullom,* 84 Colo. 433, 271 Pac. 187.

All of the lode locations here involved were in the area theretofore patented by Cora A. Beardsley, one of the plaintiffs in error, under the stock raising homestead law (Act of December 29, 1916, 39 Stat. 864). The patent contained the usual reservations to the United States of all coal and other minerals upon or within the land, together with the right to prospect for, mine and remove the same. Section 9 of the Act, inter alia, provides: "* * * Any person qualified to locate and enter the coal or other mineral deposits, or having the right to mine and remove the same under the laws of the United States, shall have the right at all times to enter upon the lands entered or patented, as provided by this Act, for the purpose of prospecting for coal or other mineral therein, provided he shall not injure, damage, or destroy the permanent improvements of the entryman or patentee, and shall be liable to and shall compensate the entryman or patentee for all damages to the crops on such lands by reason of such prospecting. Any person who has acquired from the United States the coal or other mineral deposits in any such land, or the right to mine and remove the same, may reenter and occupy so much of the surface thereof as may be required for all purposes reasonably

incident to the mining or removal of the coal or other minerals, first, upon securing the written consent or waiver of the homestead entryman or patentee; second, upon payment of the damages to crops or other tangible improvements to the owner thereof, where agreement may be had as to the amount thereof; or, third, in lieu of either of the foregoing provisions, upon the execution of a good and sufficient bond or undertaking to the United States for the use and benefit of the entryman or owner of the land, to secure the payment of such damages to the crops or tangible improvements of the entryman or owner, as may be determined and fixed in an action brought upon the bond or undertaking in a court of competent jurisdiction against the principal and sureties thereon, * * *.''

It is conceded that consent to the prospecting or mining operations was not given by the patentee and that no bond was filed by the lode claimants until July, 1934, a considerable time after the locations were made. Upon this premise plaintiffs in error assert that the lode locations were initiated in trespass and therefore are invalid. It is evident the statute contemplates that a person qualified to locate mineral deposits, may at all times enter the homestead to prospect for mineral therein, and as a necessary incident to this right, locate under the appropriate act such mineral as he may discover, subject only to his liability to the homestead entryman or patentee for damages to crops and the prohibition against injury to permanent improvements. Having made his location, and thereby secured the right to remove the minerals, in the words of the statute he ''may reenter'' and occupy so much of the surface as may reasonably be required in his mining operations by securing the consent of the homesteader, paying the damages caused by his operations or filing the required bond. The securing of the patentee's consent, or in lieu thereof posting the bond, is not a condition precedent to the location, but is incident to the mining operations *subsequent* thereto. Further, the clear purpose of the statute is not to restrict prospecting and mining oper-

ations on lands entered or patented under the stock raising homestead act, but to assure compensatory protection to the homesteader. A controversy on this score must be between the mineral locator or operator and the homestead entryman or patentee in such capacities, and can have no bearing on the rights of claimants under conflicting mineral locations.

The lease to the plaintiffs covered only the "Mica Lode," as a consequence of which the adjudication sought by the complaint was limited to this claim. The plaintiffs in error answered claiming the premises under their 160-acre placer location which embraced in its area the "Mica Lode." The Colorado Feldspar Company then pleaded the location of its lode claims Suzana 1 to 5 and Feldspar 1 and 2, all included in the surface areas of the placer, and prayed that title to said lode claims be quieted in it as against the placer claimants.

Plaintiffs in error now insist that since the original plaintiffs had no interest in the seven Suzana and Feldspar claims, the determination of the right of possession thereto has no place in this proceeding. In making this contention they entirely overlook the fact that they asked for the recovery of the possession of the entire Mica Hill Placer No. 1 mining claim, and had they prevailed on the merits, the decree properly would have nullified the right of lode claimants to all lode claims within the exterior boundaries of the placer.

Of necessity under the issues, either the lode claimants or the placer claimants, to the complete exclusion of the other must have been awarded possession of the premises covered by their respective locations, and the unsuccessful parties cannot now complain because the relief sought by them is accorded the successful litigant.

The area of the placer as located and filed exceeded the combined area of all of the involved lode claims. The plaintiffs in error complain that the decree, and particularly paragraph nine thereof, enjoining them from further proceeding with the placer patent applica-

tion, by reason of its phraseology, goes beyond the issues involved, in that it has the effect of settling adversely to them the right to that part of the placer claim outside the eight lode locations.

Clearly the decree should not adjudicate beyond the area awarded the lode claimants and, taken in its entirety, we believe might be construed to do so. In order, therefore, that there may be no question concerning the matter the trial court is directed to correct the decree, and particularly paragraph nine, so as to expressly limit its application to the premises embraced within the lode locations.

So corrected, we believe paragraph nine, supra, is not subject to objection.

■■■■■ The question whether a mineral deposit is subject to location as a lode or placer is not exclusively within the jurisdiction of the Land Department, and may be adjudicated by a court in determining the right of possession to the ground in controversy. *San Francisco Chemical Co. v. Duffield, supra; Webb v. American Asphaltum Co., supra.*

The judgment is affirmed. The decree to be corrected as directed. The costs of the supplemental abstract filed by defendants in error, which we find was unessential, will be taxed to them under our Rule 36.