SUPERIOR SAND AND GRAVEL MIN-
ING CO., Inc., a corporation,
Appellant,

v.

TERRITORY OF ALASKA, Appellee.

Vernon C. SCHUBERT, Dorothy Schubert,
Clarence D. Smith, Jr., Lillian E. Smith,
Eugene E. Saxton, Dorothy M. Saxton,
Ellsworth E. Saxton and Grace D. Sax-
ton, Co-Partners doing Business as the
Northern Construction Association, and
Ellsworth E. Saxton, as Agent for said
Association, Appellants,

v.

TERRITORY OF ALASKA, Appellee.

No. 14190.

United States Court of Appeals
Ninth Circuit.

July 18, 1955.

Rehearing Denied Sept. 20, 1955.

John E. Manders, Anchorage, Alaska,
for Superior Sand & Gravel Mining Co.

E. L. Arnell, Anchorage, Alaska, for
Northern Construction Association &
Ellsworth E. Saxton, Agent.

Verne O. Martin, Anchorage, Alaska,
for appellants.

Juliana D. Wilson, Anchorage, Alaska,
for Anchorage Sand & Gravel Co., Inc.

J. Gerald Williams, Atty. Gen., Thom-
as B. Stewart, Asst. Atty. Gen., Terri-
tory of Alaska, for appellee, Territory of
Alaska.

Before HEALY, POPE, and FEE, Cir-
cuit Judges.

HEALY, Circuit Judge.

In November of 1950 the appellants
severally made conflicting placer loca-
tions upon a section of Alaska school
lands described as Section 16, T. 13
North, R. 3 West of Seward Base Merid-
ian. Shortly thereafter one of them filed
in the United States Land Office an ap-
plication for mineral patent pursuant to
the provisions of 30 U.S.C.A. §§ 29 and
30. The other locators interposed ad-
verse claims, and in support thereof, as
the statute requires, brought suits in
the court below for judicial determina-
tion of their respective rights. The Ter-
ritory of Alaska was made a party de-
fendant in each of the suits, which latter
were by the court ordered consolidated
for purposes of trial or other disposition.

The school section in question lies im-
mediately adjacent to the corporate lim-
its of the City of Anchorage. It is un-
derlaid in its entirety by sand and gravel
containing, apparently, no precious or
base metals of any kind. The deposits
are of the ordinary type of sand and
gravel and have no definite chemical com-
position. Their value is attributable to
their proximity to Anchorage, a large
and growing city, and to the fact that

they are in great demand for their utility in the building industry and in the construction of highways.

The Territory moved for a dismissal of the actions on a number of grounds, one of which was that ordinary sand and gravel are not minerals within the meaning of that term as used in the mining laws of the United States. Another ground was that the lands staked were not at the time of their location open to mineral entry and claim because presently in possession and in use by the Territory and its lessees. Subsequently, testimoney was offered and there were informal stipulations or concessions of fact concerning the existing situation in the area. The facts thus shown or admitted were that prior to the time of the attempted mineral locations the section had been leased in its entirety by the Territory to various parties, including the City of Anchorage, for the purpose of making and developing a variety of surface uses which were then being carried on or in process of development by the lessees. In effect, the Territory's motion for dismissal was transmuted into a motion for summary judgment. In granting the motion the court contented itself with holding as a matter of law that sand and gravel possessing, as here, no particular property or characteristic which would enhance their value above that which is attributable to their proximity to the scene of construction operations, are not mineral, hence not subject to location under the mining laws. The opinion below is reported in D.C., 114 F. Supp. 436.

In brief and oral argument on appeal the parties have discussed at length the question posed by the holding of the trial court, the Territory on the one hand seeking to sustain the holding and the appellants on the other striving to demolish it. For reasons presently to be given we do not reach the problem so presented. The decisions bearing upon it, namely those of the General Land Office and of the few courts which have spoken on the subject, are collected in the opinion of the trial

judge and are available to the general reader. We are of the view that the judgment below is subject to affirmance on other grounds, to which we now turn our attention.

In 1915 Congress passed an Act reserving to the Territory of Alaska sections 16 and 36 of each township, upon survey thereof, for the support of the territorial common schools. 38 Stat. 1214, 48 U.S.C.A. § 353. The Act provided that the Territory may, by general law, provide for leasing school lands in area not to exceed one section to any one person for not longer than ten years at any one time. To implement this authority the Alaska legislature in 1933 enacted a statute which is to be found in the Alaska Compiled Laws, 1949. Section 47–2–78 thereof reads: "The Governor is hereby authorized to lease all lands surveyed and reserved for the support of the public schools in this Territory as provided in Section One of the Act of Congress approved March 4, 1915, * * * and all leases so made shall be in conformity with the authority granted the territory in said Act." Section 47–2–80 of the statute as codified provides that the Governor shall fix a reasonable rental for such lease, and that the proceeds from all leases shall be paid to the territorial treasurer and by him be covered into the school fund.

In 1939 the Congress amended its 1915 Act by insertion of a provision that timber on the school lands might be sold by the Secretary of the Interior, the proceeds to go to the Territory for school purposes. The 1939 amendment further provided that "such lands and the minerals therein shall be subject to disposition under the mining and mineral leasing laws * * * *upon conditions providing for compensation to any Territorial lessee for any resulting damages to crops or improvements on such lands, * * *.*" [Emphasis supplied.] The Secretary of the Interior was authorized by the amendment "to make all necessary rules and regulations in harmony with the provisions and purposes of this Act

for the purpose of carrying the same into effect." 53 Stat. 1243, 48 U.S.C. § 353 (1946 Ed.).

No regulations were promulgated by the Secretary. Nor is there any indication in the record here that the appellants, either prior or subsequent to entry and the staking of their claims, sought or obtained the consent of the Territory or of those occupying under it, or that they took any steps to indemnify either. As already said, the school section involved had previously been entirely leased pursuant to territorial law for the purpose of making and developing various surface uses. An exception to the existing surface uses was a limited and defined area of the section from which gravel was currently being extracted by a concern called Anchorage Sand and Gravel Company under a permit or contract for the purchase of the material under the Materials Act, 43 U.S.C.A. § 1185 et seq. The Governor of the Territory had granted permission to the Bureau of Land Management for the execution of that contract or permit, and approval thereof had also been had from the City of Anchorage, the lessee of the area affected. The proceeds from this grant or contract were by the Materials Act coverable into the territorial school fund.[1]

The Territory contends that, absent the promulgation of appropriate regulations by the Secretary as prescribed in the 1939 amendment, the Act as there amended did not become effective as regards school lands under lease by the Territory. Hence, it is said, no valid entry upon or valid mineral location could be made on the section in the absence of consent by the occupants or of prior provision for their protection. In reply, appellants argue that provisions for indemnification prior to entry and location are not requisite under the law. By way of analogy, it is urged that under the 1916 Act of Congress providing for the making of Stock-Raising Homestead entries, 39 Stat. 862, 43 U.S.C.A. § 291 et seq., the courts had recognized the right to enter upon such homesteads and to locate claims thereon prior to making provision for compensation for damages suffered by the homesteader.

The Stock-Raising Homestead Act affords more of contrast than of analogy. Section 9 thereof, 43 U.S.C.A. § 299, reserves the minerals in homesteaded lands "together with the right to prospect" for the same, plus the implicit right of the prospector to locate claims in event mineral is discovered. Proceeding, it grants to the locator in the following language the right to "reenter" and mine his claims: "Any person who has acquired from the United States the coal or other mineral deposits in any such land, or the right to mine and remove the same, may *reenter* and occupy so much of the surface thereof as may be required for all purposes reasonably incident to the mining or removal of the coal or other minerals, first, upon securing the written consent or waiver of the homestead entryman or patentee; second, upon payment of the damages to crops or other

---

1. The Materials Act, adopted in 1947, authorizes the Secretary of the Interior to dispose of sand, gravel, and other named materials under certain restrictions, one of which is "if the disposal of such materials (1) is not otherwise expressly authorized by law, including the United States mining laws". The Act provides that all moneys received from the disposal of such materials from school section lands in Alaska are to be set apart as separate and permanent funds in the territorial treasury to provide income for common schools.

In passing, we note a departmental decision handed down October 14, 1952 (in a case designated as A–26443, Matter of Mrs. A. T. Van Dolah), which indicates a departmental construction, then obtaining, to the effect that materials or deposits subject to location and patent under the mining laws are not subject to sale under the Materials Act. Thus the sale of gravel to the Anchorage Sand and Gravel Company, referred to in the text, would appear to import a view on the part of the Bureau of Land Management that the sand and gravel deposits in question here are not subject to location under the mineral laws. This transaction thus lends a measure of support to the decision of the district court.

tangible improvements to the owner thereof, where agreement may be had as to the amount thereof; or, third, in lieu of either of the foregoing provisions, upon the execution of a good and sufficient bond or undertaking to the United States for the use and benefit of the entryman or owner of the land, to secure the payment of such damages to the crops or tangible improvements of the entryman or owner, as may be determined and fixed in an action brought upon the bond or undertaking in a court of competent jurisdiction * * *." [Emphasis supplied.] In short, totally unlike the statute before us, the Act itself spells out in detail the rights of the prospector and the time and manner of their exercise. It defines his obligations to the homesteader and prescribes the time when and the manner in which the obligations are to be performed.

We have found but two cases dealing with this aspect of the Stock-Raising Homestead Act, namely McMullin v. Magnuson, 102 Colo. 230, 78 P.2d 964, at pages 972–73, and Scoggin v. Miller, Wyo., 189 P.2d 677, at page 692. Those decisions deal with a variety of questions most of which are of no importance here. Of interest at the moment is a contention made in both cases that in going on the land initially without the consent of the homesteader or without having made provision for his indemnification, the mineral locator was a mere trespasser, and since his location had been initiated by trespass the location was invalid. The courts rejected the contention, noting the specific provisions of the Act to which we have called attention.

In formulating its grazing homestead legislation in the language quoted above Congress had in mind the traditional prospector and his search for minerals on the public domain. These rights of prospecting and of locating claims on discovery of mineral had to be reserved if the reservation of minerals in homesteaded lands were to have any practical consequences. But in the situation before us no prospecting for discovery purposes was requisite inasmuch as the presence of the sand and gravel deposits was obvious, and their character as well as their existence had long been a matter of common knowledge. As already seen, areas of the deposit had been sold under the Materials Act with the approval and for the financial benefit of the Territory. It may be observed at this point that no discernible financial benefit would accrue to the Territory from the location or exploitation of these valuable deposits under the mineral laws, beyond the trifling five dollars per acre to be exacted from the claimants upon their obtaining mineral patent.

Our task is to construe the 1939 statute, supra, and to determine the congressional intent in light of the practical situation which this case presents. Doubtless many of the school sections in Alaska are not under lease either wholly or in part, and as to such lands it is to be assumed that consent of the Territory to entry and the staking of mineral discoveries was not intended to be a condition precedent. But here the Territory was in possession and was in process of administering the reserved land in the manner and for the purposes authorized by Congress. Unlike lode claims, which may be worked without serious interference with surface uses, these placer locations and their exploitation would be utterly incompatible with the uses to which the school land was currently being put. Unregulated mineral entry upon the premises in such circumstances would inevitably give rise to chaos and controversy, and it is inadmissible to ascribe to the Congress a purpose productive of such results.

We think it would not be going too far to say that the mineral locations here were initiated by trespass, and for that reason alone were invalid. But it is unnecessary to rest decision upon that ground. We are of opinion that Congress can not be held to have intended the 1939 legislation to become effective as to lands under existing lease in the

absence of the contemplated administrative regulations for the safeguarding of the interests and the protection of the rights of those holding under the Territory. A less stringent construction would tend, as this case amply demonstrates, to thwart the purpose which the Congress had in mind in setting apart these lands for the benefit of the territorial common schools. The statute, unclear as it is, must be interpreted in such manner as to effectuate its purposes, not to circumvent them. Accordingly we hold that the land was not open to mineral entry at the time appellants' locations were made, hence the locations are invalid.

The judgment is affirmed.