John David YENCH, Appellant,

v.

Ted P. STOCKMAR et al., Appellees.

No. 72–1692.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted March 29, 1973.

Decided Aug. 23, 1973.

Hubert M. Safran, Denver, Colo., for appellant.

Arthur P. Roy, Asst. Atty. Gen. (John P. Moore, Atty. Gen., and John E. Bush, Deputy Atty. Gen., with him on the brief), for appellees.

Before PHILLIPS, SETH and HOL-LOWAY, Circuit Judges.

SETH, Circuit Judge (By reassignment from HOLLOWAY, Circuit Judge).

Appellant appeals from a judgment dismissing his action against the Board of Trustees of the Colorado School of Mines, Golden, Colorado, the School itself, its President, its Dean of Students, and student and faculty members of its "ad hoc Student Conduct Committee." Mr. Yench sought a declaratory judgment to determine whether his dismissal from the School violated the provisions of 28 U.S.C. §§ 1343(3) and (4), 2201 and 2202, 42 U.S.C. §§ 1981, 1983 and 1985, and the First, Fifth and Fourteenth Amendments to the Constitution. He also sought to enjoin the defendants from refusing to admit him to classes at the School.

Mr. Yench began his classes at the School in the fall of 1965. During the 1969–70 academic year he was the editor of a student newspaper. On September 23, 1969, there appeared in the paper language which certain members of the School's administration found objectionable. The School's President, and the Dean of Students received complaints concerning the language in the paper from faculty, alumni, trustees, and townspeople. The Dean had a discussion with Mr. Yench concerning the language. On November 14, 1969, President Childs called a meeting at which Dean Smiley, Mr. Yench, and other students on the paper were present to discuss the use of "objectionable" language in the paper. At the close of this meeting, President Childs advised Mr. Yench that he was on "probation as editor."

On February 2, 1970, the paper published another story containing language which the School's administration also considered objectionable. President Childs called another meeting on February 12, 1970, which was attended by Dr. Childs, Dean Smiley, Mr. Yench, and others from the paper. There is some dispute in the testimony, but the District Court found that, at this meeting, Mr. Yench was notified that he was on "disciplinary probation as a student."

About a week later, President Childs had another meeting with Mr. Yench, attended also by Dean Smiley, at which Mr. Yench was advised that his disciplinary probation as a student would continue until his graduation and that should he violate the School's regulations he would be dismissed. Mr. Yench testified that he could not recall that his probation had been expanded at the February 12, 1970, meeting, and that he did not recall the meeting of February 19, 1970. Relations between Mr. Yench and the School's administration appear to have been tranquil from February 19, 1970, until May 28, 1971.

The School permits students who will complete their degree requirements in the next succeeding summer to participate in the spring commencement as no summer commencement is held. Mr. Yench, who was to have completed his degree requirements in the succeeding summer, sought to participate in the May 28, 1971, degree ceremonies. He appeared in the area where the students were assembling, wearing a "Mickey Mouse" hat instead of the standard mortarboard. Prior to the ceremony, and while he was still in the dressing area, a representative of the Dean of Students office asked him to remove the hat. He declined to do so. While seated in the auditorium, Mr. Yench was sent a note by the Dean of Students advising him to remove the hat or discontinue his participation in the ceremonies. He further declined to do so. When he approached

the platform, still wearing the hat, his name was not called, and the next student's name was called. Mr. Yench, following the last student, mounted the platform, shook the President's hand as did the other preceding students in the ceremonies, announced his name into the public address system, and returned to his seat. One other student from India who had received prior approval participated in the ceremonies wearing a turban.

About two weeks after the graduation ceremony, the Dean of Students notified Mr. Yench by letter that he was on temporary disciplinary suspension and that a hearing would be held the following day to inquire whether or not he had violated a previously imposed disciplinary probation. Mr. Yench was charged with violating the "Standards and Codes of Conduct" of the Colorado School of Mines as stated in the Student Handbook 1970–71 (page 28), specifically:

(1) Failure to comply with the directions of authorized officials acting in the performance of their duties.

(2) Intentional obstruction and disruption of a university activity.

(3) Disorderly conduct on university-owned property at a university-sponsored function.

(4) Violation of published Colorado School of Mines policy.

(5) Conduct which adversely affected functions of the Colorado School of Mines being conducted in pursuit of its educational purposes and objectives.

The letter also described the time, place, and conduct which allegedly violated the "Standards and Codes of Conduct."

A hearing was held on June 15, 1971, before the ad hoc Committee on Student Conduct after Mr. Yench's request for a continuance was denied. The committee was composed of faculty members and students. Mr. Yench appeared at the hearing with counsel who was not permitted to speak, but was allowed to advise Mr. Yench. The Dean of Students read a statement to the committee listing the charges and briefly describing Mr. Yench's conduct with reference to each charge. This was the only evidence introduced at the hearing against Mr. Yench. Mr. Yench was then permitted to make a statement on his own behalf and to call witnesses; however, he was not permitted to cross-examine the Dean of Students.

On June 21, 1971, the committee issued its conclusions in a memorandum to the Vice President for Academic Affairs in which it found Mr. Yench guilty of charges (1), (3), (4), and (5), and not guilty of charge (2). The committee's findings were sent to Mr. Yench by the Dean of Students, and he was notified, by letter about three weeks later that the School's President, Dr. Childs, had reviewed the committee's findings and determined that Mr. Yench should be dismissed from the School. Accordingly he was dismissed.

■ The principal argument advanced on this appeal is directed to the procedure, or lack of procedure, followed when Mr. Yench was put on probation, and to the reason why such action was taken. The School had adopted and published in a Student Handbook the procedure for disciplinary proceedings of this nature. It is apparent that the parties did not follow it. We are thus concerned not with the relationship of the rules to due process standards as in Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir.), but instead with the consequences of a failure to follow the published rules.

The initial disciplinary action was directed to probation of Mr. Yench as editor and subsequently as a student. This action resulted from a series of meetings or discussions directed to disciplinary action at which the Dean of Students, Mr. Yench, and other students on the paper were present. There is no contention that these sessions were not instituted with some disciplinary action in view. In such a situation the student and the faculty were both responsible for conformance to published procedure.

However, if neither the student nor the faculty wished to follow the procedure, there was nothing which required that it be done. The machinery was made available by the published rules, but if neither party wanted to avail itself of it, and made no move to do so, there is no one to object. Mr. Yench had just as much right or duty to use or request the published procedure as did the School authorities. He made no attempt to do so, and he cannot now object to the choice he made. Student disciplinary proceedings are not comparable to criminal proceedings. See Norton v. Discipline Committee of East Tennessee State University, 419 F.2d 195 (6th Cir.), and Esteban v. Central Missouri State College, 415 F.2d 1077 (8th Cir.). It appears that the disciplinary meetings, and in fact the formal procedure prescribed by the rules, were part of the educational process conducted by both faculty and students.

Mr. Yench has acquiesced as a matter of law in the probationary status which resulted from the incidents relating to the paper. The record shows that he was placed on probation as a student on February 12, 1970. There was no objection made by him to this status and he made no attempt to seek any change through any school authorities or the Student Conduct Committee. This silence and inaction continued until at least the formal hearing of June 15, 1971, leading to expulsion for the graduation ceremonies incident. This constitutes an acquiescence in the initial procedure and in the probationary status which had continued for this period of about a year and four months.

As to the nature of acquiescence, the Colorado Supreme Court in McMullin v. Magnuson, 102 Colo. 230, 78 P.2d 964, considered litigation over a mining claim which had been tried to the court, but the federal statute provided that there be a jury. The complaining party had proceeded with the trial, and the court on appeal in part said: ". . . their silence must be deemed to have been an acquiescence in the procedure followed of which they cannot now complain." The term has been defined in Humboldt Livestock Auction, Inc. v. B & H Cattle Co., 261 Iowa 419, 155 N.W.2d 478:

"'Acquiescence' is where a person knows or ought to know that he is entitled to enforce his right or to impeach a transaction, and neglects to do so for such a length of time as would imply that he intended to waive or abandon his right."

It has also been defined as consent to the conditions, United States v. Wilcox, 258 F.Supp. 944 (N.D.Iowa), and is familiar in situations where a party has acquiesced in the terms of a judgment and thereby loses a right to appeal. Roussel v. Marshall, 86 So.2d 758 (La. App.). See also Galion Iron Works & Mfg. Co. v. J. D. Adams Mfg. Co., 128 F.2d 411 (7th Cir.). This court considered acquiescence in the handling of certain shares of stock as barring a claim to ownership in Alexander v. Phillips Petroleum Co., 130 F.2d 593 (10th Cir.). Under the record before us, as we have above held, Mr. Yench acquiesced in both the disciplinary proceedings and the resulting status in which he was thereby placed. He cannot now complain of them.

The rights of students are well described in Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266; Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731; Papish v. Board of Curators of the University of Missouri, 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618, and Trujillo v. Love, 322 F.Supp. 1266 (D.Colo.), and need not be repeated here. However, every disciplinary event cannot give rise to a constitutional question and a right to have the federal courts intervene. See Freeman v. Flake, 448 F.2d 258 (10th Cir.); Smith v. Kansas, 356 F.2d 654 (10th Cir.).

On a somewhat different approach, the trial court followed the rationale of Sill v. Pennsylvania State University,

462 F.2d 463 (3d Cir.), that there was nothing in the initial disciplinary proceeding to constitute an aggrievement in the constitutional sense. We agree. The initial disciplinary action here taken was part of the educational process as we have said. Such action leading to sanctions of severity less than expulsion do not constitute aggrievements under the Constitution, nor do they invoke the jurisdiction of the federal court regardless of the nature of the incident or the reasons for the disciplinary action. It was not a deprivation of a right requiring judicial relief, as the court held in Sill. The Sill court further said:

". . . We cannot agree that the possibility that a future sanction will be made more severe because of these infractions of discipline creates in the students on probation an aggrievement analogous to that suffered by those students who were deprived of continued attendance at the University."

We are now at this more severe sanction considered in the Sill case. This rule obviously involves a measure of the consequences, or the severity of the sanction, together with a consideration of the involvement in the educational process. See also Esteban v. Central Missouri State College, 415 F.2d 1077 (8th Cir.); Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir.); Duke v. North Texas State University, 469 F.2d 829 (5th Cir.).

Mr. Yench was expelled for a violation of his probation. This was the basis for the final disciplinary proceedings. He was found to have violated the rules of conduct in a manner totally unrelated to the reason for his probation. There was no defect in these proceedings, but there is no proof that the graduation incident itself concerned constitutional rights. The ultimate sanction of dismissal thus was built upon the previously imposed probation which arose from incidents and proceedings not of constitutional dimensions. This is a consequence of any series of disciplinary actions—the punishment becomes more severe as the infractions accumulate. The fact that the total of all infractions may aggravate the ultimate penalty does not require the courts to go back into the prior events and proceedings which, when they took place, were not such as to constitute an aggrievement in the constitutional sense. These are not criminal proceedings as has frequently been held.

 There was no procedural defect in the final disciplinary proceedings, as we have indicated. There was, however, no proof at trial on the issue of whether or not the wearing of the Mickey Mouse hat at graduation was the exercise of a right of constitutional dimensions. An answer cannot be assumed when the record is silent. Thus the case must be remanded for a determination of this issue, but is otherwise affirmed.

Affirmed in part, and remanded.