Grace ZAMORA, as Parent and Natural Guardian on behalf of Vidal Shawn (Lolly) Zamora, a minor child, Appellant,

v.

H. Fred POMEROY; Truett Worley; Elgin Mallory; H. C. Prichard; Dr. Morton Dann; Dr. Robert Smith; Stuart D. Shanor and Jane H. Baldock, individually and in their official capacity, Appellees.

No. 79–1611.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Nov. 19, 1980.

Decided Jan. 26, 1981.

---

Ramon I. Garcia and Antonio V. Silva, Southern New Mexico Legal Services, Roswell, N. M., for appellant.

John W. Bassett, Jr., of Atwood, Malone, Mann & Cooter, P. A., Roswell, N. M., for appellees.

Before BARRETT, DOYLE, McKAY, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This civil action was brought by the mother of an allegedly aggrieved high school student who maintains that his civil rights were violated contrary to 42 U.S.C. § 1983, Civil Rights Act of 1871. The son is a minor and hence the suit was brought on his behalf. The source of the claim is the conducting of a warrantless search of his school locker. That search revealed the presence of marijuana and the alternate contentions are that it was unlawful to use "sniffer" dogs to discover the drug, and that after discovery of it a warrant was essential to the opening of the locker and the removal of the marijuana.

The search referred to did not originate as an investigation of the minor son of the plaintiff. It was a general investigation. The Assistant District Attorney of the county in question contacted Mr. Worley, then Assistant Principal of the Roswell High School about conducting a search of the school lockers, using so-called "sniffer" dogs, which dogs would be available to them some time in the future. At that time no specific persons were suspected of possessing marijuana at Roswell High.

Permission for use of the dogs at Roswell High was not granted by Worley, because he had to clear it with the Principal, one Elgin Mallory. Mallory could not authorize the use of the dogs and the entry by the police officers into the school until he was granted permission by the defendant Pomeroy, the Roswell Independent School District Superintendent. After clearance was obtained from all these people, and permission was granted to conduct the program, the proposed search was started.

### The Facts from the Standpoint of Appellants

The Assistant District Attorney contacted a Special Investigation Unit in Albuquerque, New Mexico, and at that time he requested the Albuquerque Police Department to send "sniffer" dogs to conduct a search of school lockers. On or about December 15, 1977, Sergeant Ken Keller, Officers Grady Tauty and Florentino Duran brought such dogs to the Roswell High School for the avowed purpose of carrying on this search of school lockers. The Albuquerque Police Officers, with Assistant District Attorney Jay Rosenthall, proceeded to Roswell High, where they met the defendants Worley and Mallory. They entered the school building, and Sergeant Keller, Officers Grady and Duran walked their dogs from locker to locker, searching for narcotics. When the dogs demonstrated that they had discovered narcotics, the locker was opened so as to seize any contraband found there. There were two lockers which were opened.

Before the first locker was opened, Sergeant Keller inquired as to whether a search warrant should be obtained. One of the school authorities replied that a search warrant was not necessary because a consent to search had been signed by the students.[1] In any event, no search warrant was ever obtained by the police officers or by the defendants.

On December 16, 1977, the identical procedure was used to search the lockers at Goodard High School, the second high school in Roswell. Again, no search warrant was ever obtained by the police officers or by the defendants.

In the course of searching the lockers in the Roswell High School, a so-called "hit" was made by one of the dogs. It was the locker of plaintiff-appellant Zamora. The locker was opened and a substance which proved to be marijuana was found therein. Besides the substance and a leather strap, nothing else was found; neither books, clothes nor school supplies were in the locker. The marijuana was taken from the locker and given to Worley. He tested the substance and concluded that it was marijuana. Some little time after the test Vidal Zamora was taken from his classes and was questioned about the substance that had been found in his locker. Worley accused Vidal, based upon his own investigation, of having had marijuana in his possession. Zamora denied any wrong-doing and denied that the marijuana was in his possession. He said that he was not using that locker, but was using one in what was called the Vo-Core Building. Vidal was called out of class a second time. He contends that he was pressured by the defendant to confess that the alleged marijuana was his. On one occasion during the questioning, Vidal discovered that Worley was using an electronic recording device, although permission had not been asked to record his statement. It is also pointed out that he was not warned about self-incrimination. The relevance of this failure is questionable, because this procedure is not criminal in nature.

During the time Vidal was being questioned by Worley, he was given the impression, so it is maintained by counsel for Zamora, that it was his obligation to prove his innocence; and he was not told that he could confer with counsel.

Soon after these happenings, the appellant Vidal was transferred from Roswell High School to the District's Educational Services Center, another high school within the city which did not have the academic standing of Roswell High. An objection is made to the fact that Mrs. Zamora, the mother of the boy in question, did not receive notice through the mails as to what was happening. She did not, for example, receive notice, for whatever value it may have here, that charges were filed against the boy in school. Worley said that he could not get hold of her on the telephone because she did not have a telephone, and he did not mail a notice to her because he did not have an address for her.

On December 23rd the semester ended and school let out for Christmas. Mrs. Zamora sought to contact Worley during the Christmas vacation and was unable to do so. She finally contacted one Dan Gomez, an Assistant Principal, and asked about Vidal's problem. Gomez informed her that Worley was out of town and would not be back until the end of the Christmas vacation. On January 4th, Mrs. Zamora finally spoke to the defendant Worley, and she then asked why her son had been "expelled" from school, and inquired as to what was needed to get her son back into school. At that time a meeting was arranged with the defendants Worley and Mallory at Worley's office.

On January 9, 1978, Mrs. Zamora went to the offices of the Southern New Mexico Legal Services, and obtained counsel. Also on January 9th they were given an appointment with the principal. The lawyer, so it

---

1. A notice that the lockers were subject to being opened was given to each student at the beginning of the year. However, another version of what was said in response to the inquiry as to the necessity of a warrant was that "there was no need for a warrant, because we had no intentions of taking criminal action." Deposition of Elgin Mallory, p. 25.

is said in the appellants' statement of the case, had no prior notice of the fact and was unable to make any preparation. At the meeting the Zamoras were informed by the defendants, so it is charged, that he had to prove his innocence in order to avoid being expelled from school; that a substance alleged to be marijuana was found in his locker and that the search of the lockers was legal. The point was made that there was no opportunity for cross-examination, etc., and the meeting was ended in a short time. The plaintiffs argue that Vidal was expelled from the high school. The order transferred him to the Educational Services Center.

On January 9, 1978, counsel for the Zamoras talked to the defendant H. Fred Pomeroy, who said he would think about giving Vidal a further hearing. On January 13, 1978, the lawyer for Zamora received a letter from the school's attorney, informing him that although they were not entitled to a hearing, one would be provided. Counsel for the Zamoras were not informed in the letter of the charges against Vidal, or any of the facts, so they say, on which the decision to "expel" Vidal was made.

A hearing was held on January 18, 1978, before a school hearing authority, which consisted of three Roswell Independent School District employees. It is maintained by the Zamoras that the hearing was not fair. Then on February 20, 1978, a hearing was held before the school board; about the same evidence, the Zamoras say, was presented on that occasion, and no opportunity was given for cross-examination. Mr. Worley did state that he had had no reason to believe that there was contraband in any of the lockers, but the school board affirmed the decision of the hearing authority.

*The Version of the School Authorities*

The defendants' side of the case brings out the fact that Zamora was enrolled in a special program for students who were potential drop-outs; that the courses given to him were easier ones than were offered average students. Even though Vidal was residing with his mother, he gave a different address, namely 1416 Hendricks in Roswell, as his address, and he knew that the notices from school would be sent to the latter place. It was brought out that during his high school career, Vidal's attendance was poor, and that he had a history of disruptive conduct and insubordination.

During the 1977–1978 school year the State Board of Education Regulation 77–3 was in effect. It prohibited the sale, possession, transportation or use of marijuana on school premises, and had a provision with regard to search of lockers, which said general searches of school property, including lockers and school buses, may be conducted at any time with or without the presence of students. This policy, so it is said, was adopted by the District Board of Education. Section 5130 was in effect at all times material to the action. It was contained in a publication entitled "Rights, Responsibilities and Limitations of Students" which Vidal read at the beginning of the 1977–1978 school year. The administration policy on lockers was published in the student handbook, a copy of which was given to each student. It was stated that lockers remain under the jurisdiction of the school, notwithstanding the fact that they were assigned to individual students; that the school reserved the right to inspect all lockers at any time; that the students were to assume the full responsibility for security of the lockers, were to make certain that they were locked after being opened, and that the combination should not be given to a friend. It was in accordance with these locker policies that the instant search was made. (So the appellees argue.)

Although the search of the lockers and the use of the dogs was brought about through the District Attorney, the District Attorney assured the school officials that he was not doing it in any official capacity; that no charges or arrests would be made as a result of the demonstration; and that if marijuana was found the decision as to action against the offender would be left to the school authorities. The search (so it is

argued) was performed under the sole control and direction of Mallory, and not the Assistant District Attorneys, who were there just as observers.

The dogs arrived with their trainers after classes were over on a particular day. Those witnessing the demonstration included the teachers, some students, the two Assistant District Attorneys and security officers of the Roswell High School, together with defendants Mallory and Worley. Each dog was accompanied by a Principal or Assistant Principal, who walked with them down the halls of the school where there were some 2,000 lockers. When a dog would "key" in on a locker, that locker would be marked, and if the dog keyed three times on any one locker, Worley or Mallory, who had master keys to all lockers, would open it to inspect it. Only school officials opened the lockers.

During the demonstration, one of the trained dogs keyed in on Locker 875, that of Vidal. (Defendant's Exhibit B). Worley opened the locker and took possession of the substance and secured it. Two tests were made, one of which was by the police. Both tests revealed that the substance was marijuana. The next morning Worley met with Vidal in his office. Vidal was told that marijuana was found in the locker assigned to him, and that he was responsible for its contents; that the matter would be investigated and they would like to have any evidence or information that would be helpful to Vidal. Vidal represented to Worley that he had no locker, but later admitted that Locker 875 had been assigned to him, and that he was responsible for its contents. Vidal was requested to provide supporting evidence or witnesses, but he was unable to do so. The school officials made no disposition of the matter at that time.

The evening after the inquiry Vidal advised his mother that he had been called into the office and charged by school officials with having marijuana in his locker, and that it could lead to his being suspended. He discussed with her what had occurred, but was unable to explain how the marijuana got into his locker. Worley and another Assistant Principal, Mr. Gomez, conferred with Vidal on Monday, December 19th. Vidal was advised that the matter was still being investigated, and that no evidence had come to light to support his innocence; and that Vidal would be held responsible unless he produced further evidence. Vidal was specifically asked to come up with further evidence and witnesses to support his innocence; he failed to provide it. He was advised that if he was suspended he would have a right to appeal the matter, and would have a hearing, and it was explained how an appeal would be carried out. No decision was made at this time.

On December 21, 1977, Worley invited Vidal to his office, but Vidal was unable to produce further evidence or witnesses. Worley then made the decision to refer Vidal to the Educational Services Center effective January 9th, so Vidal could complete the second semester, and receive credit for his first semester courses. Worley advised him that he did not have Vidal's address, and asked Vidal for his parents' address and telephone number. At that time Vidal replied that he had no parents. He did not give Worley his mother's telephone number or address. Vidal was given a form referring him to the ESC with the request that he return the form after taking it to his teachers for completion. This form was never returned to the school officials. The same day Worley instructed his secretary to send a letter to Vidal's home, notifying Vidal's parents of the referral and mailing them a copy of the completed referral form. Worley was unaware of the fact that Vidal did not return the form, and consequently, no notice was mailed to his parents of record. Worley made no further attempt to contact Vidal's parents, as he assumed the form had been mailed. The same day Vidal completed his last class for the semester and was out for the holidays. The first day after the holidays and the first day of the second semester was January 9, 1978.

On December 22nd, Mrs. Zamora telephoned Worley at Roswell High School and

told him she had received word that Vidal had been "suspended". He advised her of the charge and the nature of the evidence against him, and of the proposed referral of Vidal to the ESC, which is another school to which he was assigned. Also, she was told how plaintiff could appeal from the decision of the principal and could obtain a hearing. A few days later Vidal again discussed the matter with plaintiff and advised her he was being referred to the ESC.

Prior to January 9, 1978, plaintiff (the mother) had a conversation with Mallory about the incident. In that conversation she requested that an informal hearing before Mallory be set for the morning of January 9th. At this time a final decision to refer Vidal to ESC had not been made. Plaintiff, Vidal, her attorney and the attorney's assistant, Worley and Mallory attended that hearing on January 9th. Plaintiff and Vidal were again afforded the opportunity to produce evidence helpful to Vidal, but none was produced. Plaintiff's attorney was afforded the opportunity to examine both Worley and Mallory, and was shown the marijuana found in Vidal's locker. After the hearing the decision was made to refer Vidal to the ESC.

The next occurrence was a hearing before a three-teacher hearing authority on January 18, 1978. This was a review of the administrative decision and resulted in an approval of it.[2]

On February 28, 1978, a special meeting was held by the Board of Education, and that body approved what had been done. Vidal attended ESC during the spring semester, continuing the same academic courses that he had taken at RHS the previous semester, including counseling and guidance. Upon arriving there he was tested in order to ascertain his level of achievement and competence, and was thereafter instructed accordingly. He was given full credit for all courses taken in the past. Vidal became a senior at RHS the next fall and has since graduated from RHS. He was never prosecuted nor was other action taken of a legal nature.

*Points Advanced on this Appeal*

The issues presented on behalf of the appellant are as follows:

I. That the court erred in granting summary judgment, inasmuch as there were issues of material fact. Under this heading also it is maintained that the plaintiffs had standing to raise constitutional claims, and secondly, that genuine issues did exist as to whether there were violations.

II. That the district court improperly granted summary judgment because there were disputed facts which do not entitle the appellees to summary judgment as a matter of law.

I.

The initial question is whether in the light of the facts, the case before us is one of constitutional magnitude. True, Vidal's locker was opened and examined without his permission and without a warrant. But the relationship is not one of defendant pitted against the state. A school discipline question is somewhat different, as we have suggested above. It poses an important public interest problem, especially where a drug is found. The school authorities cannot, of course, tolerate the storing of marijuana in a school locker by a student. It tends to be a *per se* type of infraction, and, indeed, a specific regulation issued by the school prohibits this very activity. Also to be considered is the fact that there was not an expulsion in this case; there was a transfer to another school which the plaintiff contends was not as good an educational institution as Roswell High School. No doubt it was part of the sanction to transfer him to this school rather than to expel him or allow him to continue on in Roswell High.

A further argument is the fact that the plaintiff has never conceded that he had possession of the marijuana. He claimed for a long time that he was using a locker in another part of the building, and was not

2. Neither plaintiff nor her son found the hearings unfair or unjust.

using this one. He did eventually concede that the locker was his. He failed to offer anything in the way of explanation or mitigation of this offense. These several factors differentiate this case from that before the Supreme Court in *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725.

*Goss, supra,* settled several issues which are dealt with in a case like the instant one. One of these was that students who face temporary suspension from public school have interests which qualify for protection under the due process clause of the Fourteenth Amendment. Further, Ohio granted an absolute right to an education to persons under the age of twenty-one and it was not allowed to withdraw the right on the grounds of misconduct absent fundamentally fair procedures to determine whether the misconduct had occurred. The state was required to recognize that the student's legitimate entitlement to a public education, as a property interest, is protected by the due process clause, and is not to be taken away for misconduct without observing minimum procedural safeguards required by that clause.

Misconduct charges which are sustained and recorded can damage the student's reputation as well as interfere with later educational and employment opportunities. The state's right to determine unilaterally and without *process* whether that misconduct has occurred immediately collides with the prohibitions of the constitution against arbitrary deprivation of liberty. The Court also held that a ten-day suspension from school is not *de minimis* and may not be imposed without regard to the giving of notice and hearing. Furthermore, the Court ruled that due process in connection with a suspension of ten days or less requires that the student be given oral or written notice of the charges, and if denied, he is entitled to an explanation of the evidence of the authorities, and to have an opportunity to present his version. The Court went on to say that generally notice and hearings should precede the student's removal from school, since the hearing may almost immediately follow the misconduct. But if prior notice and hearing are not feasible, as where the student's presence endangers persons or property, or threatens destruction of the academic process, immediate removal from the school may be justified, but that notice and hearing should follow as soon as practicable.

■ Our view is that there was no lack of due process in the case at bar. Numerous hearings were held, first before the principal and other officers of the high school, and finally, a special hearing was given by the school board. The fact that Vidal Zamora received a number of opportunities to be heard, including an opportunity to appear before the school board, does distinguish this case from *Goss, supra,* in which procedural due process was ignored. The student was suspended without being given a chance to present his side of the case. Here, Vidal Zamora was given many such opportunities. On at least five occasions he appeared before either the principal or other persons who were in authority, and at no time did he take advantage of the chance to explain his side and his denial of the charge or to mitigate it. The result was that the inferences which arose from the fact that the marijuana was discovered in his locker were not dispelled or overcome.

The decision here depends on the validity of the seizure rather than procedural sufficiency.

A subsequent decision of the Supreme Court frequently cited is *Board of Curators, University of Missouri v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). This case distinguished *Goss, supra,* on the ground that the Board of Curators had given fair hearings. The action taken here was dismissal from medical school! Clinical deficiencies was the reason. The Court upheld it. The reason was that repeated chances had been given. The Court there recognized the student's entitlement to due process, but held that she had been given adequate due process. Despite the successive warnings the subject failed to show improvement.

The factors here which entitle the plaintiff to careful hearing and scrutiny are the fact that he was suspended for a short time,

and transferred to another school, one which seemingly had less standing as an educational institution. He contends that the transfer constituted imposition of an excessive sanction. The other element is that the appellant was in violation of the law.

In *Sill v. Pennsylvania State University*, 462 F.2d 463 (3rd Cir. 1972), a distinction was made between a suspension from school for disciplinary reasons and the granting of probation for two years, including the denial of school privileges. In the latter type of sanction, the trial court held that the students had not been aggrieved in the constitutional sense by such punishment because they had no standing to challenge the school regulations involved or the punishment imposed. The Court of Appeals for the Third Circuit agreed that the punishment had not created aggrievement analogous to that suffered by those students who were deprived of continued attendance at the university. It was specifically ruled that the plaintiff lacked standing to maintain the action.

In the case of *Yench v. Stockmar*, 483 F.2d 820 (1973), this court held that the right to maintain a civil rights action such as that which was brought here grew out of the expulsion of the student from the educational process. Yench was a student at Colorado School of Mines who sued the board of trustees and others, alleging violation of his civil rights. He was first placed on disciplinary probation without a hearing for publishing objectional language in a newspaper which he edited, one which was distributed to the students. A year later, while he was still on probation, Yench was found guilty of various acts of misconduct at commencement ceremonies. At the commencement ceremonies he wore a Mickey Mouse hat rather than a mortar board. At the time he was one of several students who was to complete the requirements for a degree at summer school following commencement. He was given a limited hearing before an ad hoc committee composed of faculty and students, and after a finding of violating probation he was expelled. His assertion was that the initial proceedings which placed him on probation were invalid; that the school officials had failed to follow their own prescribed procedures, and thereby deprived him of due process. This court's opinion by Chief Judge Seth held that there was no recognizable constitutional right involved in the initial disciplinary proceeding. This court also held that the initial action against the student which placed him on probation did not constitute a deprivation of the magnitude required, and the court said such actions, meaning the sanctions, of severity less than expulsion, do not constitute aggrievements under the constitution, nor do they invoke the jurisdiction of the federal court regardless of the nature of the incident or the reasons for the disciplinary action. Thus, it did not constitute a deprivation of rights requiring judicial review.

In the present case the school authorities fashioned a remedy which was in harmony with the constitution. The student was not deprived of education. They went to some length to impose a sanction which would guarantee that he would continue his school work so that he could graduate. Also, after that year he was readmitted to Roswell High School, from which he did graduate. Zamora was not separated from the educational process; he completed it. Not until the first day of the spring semester, which was the first day of school after the Christmas holidays, was he transferred to and enrolled in the other school for continuation of his education for the spring semester. The hearing on January 9, 1978 had preceded this. At the ESC school he took about the same courses that he would have taken had he continued his education at Roswell High School.[3] In testifying on deposition in this case, Vidal admitted that as a result of attending the ESC, that is, the other school, the only benefit which he lost was his eligibility to play baseball. (He had not participated in that the previous year because of

---

**3.** It is noted that Vidal received poor grades at the ESC. Nevertheless, he was promoted to the senior class at Roswell High School the following semester.

misconduct.) Also, his job as a custodian, obtained through the "Vo-Core" program, for which he was paid, apparently interfered with his playing baseball. But even though he was deprived of the opportunity to participate in sports during the period immediately after the incident, this would not constitute a violation of his constitutional rights. His job as custodian was an extra-curricular activity in connection with his regular school courses or activities. He was not allowed to continue the work activities during the semester following the incident, but members of the faculty had requested that he be removed from the Vo-Core program, and in view of that the likelihood is that he would not have been allowed to participate in work activities during the spring semester, according to the affidavit of Mr. Worley.

■ In summary, although the facts *suggest* a possible violation of his due process rights, examination of the evidence in the light of the authorities negatives this. Inasmuch as the sanctions imposed were far less severe than expulsion, and in view of the fact that his offense was serious, it cannot be said that they evidence an injury within the framework of the constitution, one which is capable of supporting jurisdiction of this court. The Zamoras' allegations that the ESC was so inferior to amount to an expulsion from the educational system are not borne out by the record, and in the absence of a clear showing that the ESC assignment was substantially prejudicial, the Zamoras lack the requisite standing to attack the appellees' actions on that ground. *Sill v. Pennsylvania State University*, supra.

## II.

■ Inasmuch as the school had assumed joint control of the locker it cannot be successfully maintained that the school did not have a right to inspect it. Therefore, the search was legal once the probability existed that there was contraband inside of the locker. We fail to see that there was any violation of Vidal Zamora's rights under the Fourth Amendment. As a result of this, it cannot be seriously challenged that the school had reasonable cause to search the locker. Whether the fruits of such a search could be used in a criminal action we need not decide. An annotation in 49 A.L.R. 3rd 978, 989, summarizes this question on locker searching, as follows:

A few cases involving searches of lockers assigned to high school students have been decided not on the distinction between the school officials searching the lockers as a private individual or as a government agent. . ., but rather on the view that the student's possession of the locker was exclusive only as against fellow students and not as against school officials, who because of their quasi-parental relationship to the students had the right and perhaps even the duty to inspect such lockers. Under this view, school officials may inspect student lockers themselves or consent to such an inspection by law enforcement officers.

The particular relationship between Vidal and the school authorities serves to distinguish this case from the search and seizure cases which are relied on by the plaintiff-appellant.

The basic theory is that although a student has rights under the Fourth Amendment, these rights must yield to the extent that they interfere with the school administration's fundamental duty to operate the school as an educational institution and that a reasonable right to inspect is necessary in the performance of its duties, even though it may infringe, to some degree, on a student's Fourth Amendment rights. The courts which have considered this question have noted that the doctrine *in loco parentis* expands the authority to school officials, even to the extent that it may conflict with the rules set forth in the Fourth Amendment. Some cases have gone so far as to say that the school authorities have an affirmative duty to search the lockers.

The logical explanation for all of this is that the school authorities have, on behalf of the public, an interest in these lockers and a duty to police the school, particularly where possible serious violations of the criminal laws exist. There is no merit in

the contention that a school locker is the property of the student who occupies it *pro tem.*

In this case the appellant has acknowledged that the locker in question was assigned to him. He necessarily knew that it was a violation of school policy to have drugs on the premises. The school retained control and access to all lockers, and maintained a confidential file of all lockers and the combinations thereto. Both Worley and Mallory retained master keys to all lockers. The evidence shows that Vidal was given a handbook containing the regulations bearing on lockers, and that he was aware of the rules. Finally, the authorities hold that a school official need only have reasonable cause or reasonable suspicion in order to search a student or his locker.

The other point which is argued by the appellant is that the rights of Zamora were violated as a result of removing him from Roswell High School and transferring him to the ESC school. We have already considered this in connection with appellant's first point; to go over it again would be redundant and there is more than enough redundancy in the opinion now.

We affirm.

McKAY, Circuit Judge, concurring:

I agree completely with the court's analysis of the sufficiency of the hearing process afforded the appellant in this case which involves the management of school discipline short of expulsion and in the result. Even when appellant's allegations are treated as being true for summary judgment purposes, the process satisfied the requirements of *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Thus it is unnecessary to reach the other issues treated by the court. I express no opinion on the other issues treated.